## 15714

### ALEWINE *ET AL.* v. TOBIN QUARRIES, INC., *ET AL.*

(33 S. E. (2d), 81)

*Messrs. Wise & Whaley* and *Mr. J. F. Spears,* all of Columbia, S. C., Counsel for Appellants,

*Mr. Henry C. Miller,* of Anderson, S. C., Counsel for Respondents,

February 16, 1945.

MR. ASSOCIATE JUSTICE OXNER delivered the unanimous Opinion of the Court:

This is a proceeding under the Workmen's Compensation Act by the widow and a minor child to recover compensation for the death of Oscar Sloan Alewine who was employed by Tobin Quarries, Inc. From an order by the Industrial Commission in favor of claimants, the employer and carrier have appealed.

The South Carolina Public Service Authority (hereinafter called the Authority) entered into a contract with the Central Engineering Company to do certain work on the Santee-Cooper project in Berkeley County, South Carolina. The prime contractor sub-contracted to Tobin Quarries, Inc., a certain portion of this work, which included building dikes on the project. R. H. Holliday of Anderson, S. C., rented to Tobin Quarries five dump trucks to be used in hauling dirt to the point where the dikes were being built and assisted it in securing drivers, who, however, were employed and paid by Tobin Quarries, Inc. Holliday was instrumental in securing the services of three men from Anderson whom he had known before. One was Alewine and

the others were D. B. Scott and H. D. Coe. Following the arrangements made by Holliday, these three men went to Moncks Corner, where Tobin Quarries, Inc., maintained an office, on the morning of April 16, 1942, to secure work as truck drivers.

Both Coe and Scott testified that they were advised in Moncks Corner that it would be necessary for them to join a labor union. They first went to the office of this union. for the purpose of meeting this requirement. After doing so, they then went to the office of Tobin Quarries. A Mr. Barnes was "job manager" in this office and in charge of hiring employees. They testified that they were then employed by Barnes as truck drivers, but were informed by him that they could not go to work until they were inoculated against typhoid fever and vaccinated against smallpox. For this purpose they were given a slip of paper and directed to carry it to the doctor's office. Upon doing so, they found that the physician was not in the office at the time. A nurse first gave them a blood test, then the inoculation and vaccination. In vaccinating them against smallpox, the scratch method was used. After that they waited for about an hour until the arrival of the physician who gave them a physical examination. According to Coe's testimony, they did not return to the office of Tobin Quarries but, as previously directed, immediately left in a truck to go to the job, which was a distance of about 20 miles from Moncks Corner. The laborers on this job stayed in boarding houses at Russellville, a distance at that time of about nine miles from the work. After arriving at Russellville, Coe and Scott went to the job and commenced work, but by this time Alewine had become sick and feeling unable to go to the job, went to his boarding house and did not commence work until 7 o'clock the next morning.

Alewine's vaccination was successful and became slightly inflamed. He returned to his home in Anderson on the

weekend of April 18th feeling moderately well, although complaining a little of his left arm. He went back to his work on Monday morning. His arm never improved, but grew gradually worse. He made another trip to his home two weeks later. By this time his vaccination had developed into a sore about the size of a half dollar. The arm had became inflamed to the extent that it was about twice its normal size and exuded greenish-yellow pus. He had no appetite, was unable to sleep well, had intermittent chills and high fever, and vomited considerably. His weight had dropped from 218 to 187 pounds. Notwithstanding his illness he returned to his job on the following Monday morning and continued to work. On account of inability to use his left arm he required assistance in dressing and in performing his work, drove the truck with his right hand. A physician was never called. On the morning of May 9, 1942, after a restless and painful night, he started to work as usual around 7 a. m. and while riding to work in the rear of a truck, he complained of being cold and in a few minutes later collapsed, becoming unconscious. He was sent to the office of Dr. Harper, a medical director of appellant carrier, who from a casual examination concluded that Alewine was desperately ill and requested that he be immediately carried to the hospital. He lived only 45 minutes after reaching the hospital, dying about 9 a. m. From the day he commenced work until his death he never lost any time on the job.

There is a dispute as to the cause of death, respondents contending that death resulted from septicemia, while appellants contend that death resulted from a cerebral hemorrhage.

The Industrial Commission found that the relation of employer and employee existed at the time the deceased was vaccinated; that the vaccination was not done at the request of the health authorities or because of smallpox, but

solely at the request of the employer; and that death resulted from an infection of the vaccination wound, which was found to be an accident arising out of and in the course of deceased's employment. Appellants contend (1) that at the time deceased was vaccinated, he had not become an employee of Tobin Quarries, Inc.; (2) that death did not result from septicemia; (3) that if death was caused by an infection of the vaccination wound, such infection did not arise out of and in the course of deceased's employment; and (4) that the vaccination was not for the benefit of the employer, but was requested by a state agency, and under these circumstances appellants in no event could be held liable for death resulting from such vaccination.

Had the relation of employer and employee begun at the time deceased was vaccinated?

The Act defines an employee as a "person engaged in an employment under any appointment or contract of hire, or apprenticeship, express or implied, oral or written, * * *." Section 7035-2, Volume 4, Code of 1942. No award under the Act is authorized unless the employer-employee relationship existed at the time of the alleged injury for which claim is made. This relation is contractual in character and to constitute one an employee it is essential that there shall be a contract of service. However, no formality is required. The contract may be oral or written. It may be accomplished with a few words, or it may be implied from conduct without words. It is sufficient if the circumstances show unequivocally that the parties recognize each other as employer and employee. "A contract will arise even where the employer does not intend to enter into one, if his conduct is such as to lead claimant, acting as a reasonable man, or in good faith, to believe that he is being employed." 71 C. J., page 431. Moreover, "the hiring, or contract for employment, is the jurisdictional factor" and not the actual commencement of work thereunder. *Simpkins*

*v. Lumbermens Mutual Casualty Co.*, 200 S. C., 228, 20 S. E. (2d), 733, 738. In the *Simpkins case* the following from a decision of another jurisdiction is quoted with approval: "The contract * * * establishes the relationship between the parties, and not the fact whether work has actually been commenced and the employee's name placed on the pay roll and he is already become entitled to wages."

Considering the evidence with the foregoing principles in mind, we think it is sufficient to warrant the inference that the contractual relation of employer and employee existed at the time deceased was vaccinated. These men were not required to return to the employer's office after examination and vaccination, but were directed to proceed immediately to the job. The deceased would have commenced work that day as the other two men did, if he had not been unable to do so on account of illness resulting from the vaccination. It is conceded that all three men were employed. The disputed question is as to the time of employment. When did the minds of the parties meet and the contract become complete? It must have occurred when they were at the employer's office, which was before the vaccination. There were no further negotiations with the employer after that visit. According to the testimony of these men, they were not advised that the vaccination and inoculation requirements had to be met before they could be employed, but rather must be met before they went to work. It is doubtless true that if they had gone to work without vaccination and inoculation they could have been discharged for failure to carry out instructions, but it does not follow that these requirements were made conditions precedent. At the time the vaccination took place the employee was acting under the direction of his employer and was engaged in the performance of an act incidental to and connected with his employment. In passing on this issue, we must keep in mind the established rule that the Act

should be given a liberal construction in furtherance of the purposes for which it was designed and also the rule that the basic purpose of the Act "is the inclusion of employers and employees and not their exclusion; and * * * that doubts of jurisdiction must be resolved in favor of inclusion rather than exclusion." *Yeomans v. Anheuser-Busch, Inc.*, 198 S. C., 65, 15 S. E. (2d), 833, 835, 136 A. L. R., 894.

Appellants introduced in evidence the contract between the Authority and the Central Engineering Company. This contract provided that all persons when employed by the contractor should present certificates of physical examination; that blood specimens should be taken at the site of the work from all persons proposed to be employed, which were required to be submitted to the State Board of Health for tests for malaria and syphilis; and that all such persons should be vaccinated against smallpox and be given the first of three injections, to be continued at weekly intervals, of typhoid vaccine. The contract further provided that "persons tested may be employed pending receipt of the report of tests for a period not exceeding two weeks." Under the contract all charges for blood testing, vaccination and inoculation at the site were to be borne by the contractor.

Appellants say that Tobin Quarries, Inc., as a subcontractor was also bound by these provisions.

Barnes, who hired the employees, testified that no one was employed or placed on the payroll until he had obtained an "employment referral from an employment agency" and had met the foregoing contractual requirements, and that all proposed employees were advised of the necessity of doing so before they could be employed. He further testified that these requirements were of no advantage to Tobin Quarries, but the delay incident to the employee meeting them frequently resulted in a hardship when labor was needed in a hurry, and they were exacted solely because

required by the terms of the contract. According to the testimony of Coe, the men never heard of the Central Engineering Company and knew nothing of the terms of any contract between it and the Authority, or between the prime contractor and the sub-contractor. They were men of very limited education. Coe could neither read nor write. So far as they were concerned, they knew nothing except the statement of Barnes to them that they would have to be inoculated and vaccinated before going to work. The conflict in the testimony of Coe and Barnes presented an issue for determination by the Industrial Commission. It will be noted that there is no evidence that these requirements were exacted by the State Board of Health. Barnes further testified that the employee was not paid for the time consumed in being examined, inoculated and vaccinated but as pointed out in the *Simpkins case,* this was not essential in order to constitute the relation of employer and employee.

The next question relates to the cause of death. Dr. Harris, of Anderson, testified that he was the family physician of deceased; that he had known him for a period of about twenty years and had never known of his having a serious illness; that the deceased suffered to some extent with hay fever and asthma in the fall; and that he had examined him thoroughly the previous fall, including an examination of the heart, kidneys and blood vessels, and found him in good physical condition. After hearing the testimony relating to the history of the case from the time of vaccination until death, Dr. Harris testified that in his opinion deceased "died of septicemia—infection obtained from smallpox vaccination eventually killed him." Dr. Harper, a medical director of the carrier in this case, testified that deceased was brought to him in a truck in an unconscious condition on the morning of his death; that he looked at him without removing him from the truck; and realizing that he was in serious condition, requested that he be rushed to the hos-

pital. From what he was able to observe during this brief period and from the hospital records, he expressed the opinion that deceased "had a stroke of apoplexy which in the final analysis is cerebral hemorrhage." It was his opinion that deceased "had a rupture of a blood vessel in the brain, which was due in the main to tremendously high blood pressure." The physician who examined the deceased on the day of his employment did not testify. The physician who attended him at the hospital during the stay of 45 minutes before his death was not available as a witness, although there was introduced in evidence a death certificate signed by him giving cerebral hemorrhage as the cause of death. The wife of the deceased testified that her husband was 42 years of age and always enjoyed excellent health prior to this vaccination. It was the function of the Industrial Commission to pass on the conflicting testimony of these physicians. The contention of appellants that there was no competent evidence to sustain the factual finding of the Industrial Commission that the death of the deceased resulted from an infection of the vaccination wound is untenable.

The remaining two questions will be considered together. Appellants argue that the vaccination was not done for the benefit of the employer or at his instance, but was made mandatory by the Authority which appellants say was acting as an agency of the State. It is further contended that in any event there is no evidence to connect the infection of the vaccination wound with the employment of the deceased.

There is a line of cases holding that where an epidemic of disease exists, or is threatened, and vaccination is ordered, not at the instance of the employer but by competent health authorities for the benefit of the employees or the general public, pursuant to which the employees are vaccinated by physicians or nurses employed by the employer and at the

latter's expense, no liability rests on the employer for any injurious consequences resulting from such vaccination. *Smith v. Seamless Rubber Co.,* 111 Conn., 365, 150 A., 110, 69 A. L. R., 856; *Krout v. J. L. Hudson Co.,* 200 Mich., 287, 166 N. W., 848, L. R. A., 1918-F, 860; *Jefferson Printing Co. v. Industrial Commission,* 312 Ill., 575, 144 N. E., 356; annotation 69 A. L. R., page 863. But there are no facts in the case before us which support the principle underlying those decisions. There is no evidence in the instant case that the State Board of Health directed the residents of this community to be vaccinated against smallpox; nor does it appear that the Board of Health requested the vaccination and inoculation requirements found in the contract between the Authority and the prime contractor. On the contrary, the record shows at this time there was no epidemic of smallpox in this community and one of the physicians who practiced there testified that he knew of no case of smallpox at the time. All of the employees were not required to be vaccinated. For instance, Holliday, who rented some trucks to the appellant employer and who also did certain work for this employer, testified that he was not required to be vaccinated and inoculated. It is reasonable to assume that the laborers were required to be vaccinated and inoculated because of the peculiar risks to which they were subject on account of the place of work, to which the general public was not exposed. There is nothing to show that the Authority had any connection with the State Board of Health or was acting for the Board in the premises. As shown by the Act creating it, 38 St. at Large, page 1507, Sections 8555-11 to 8555-28, Code of 1942, the primary purpose of the Authority is the construction, development and operation of a hydro-electric and navigation project.

In *Neudeck v. Ford Motor Co.,* 249 Mich., 690, 229 N. W., 438, 439, an award for compensation was upheld where the showing was not as strong as that presented in the in-

stant case. The employee·there, immediately upon being em-·
ployed, was ordered by his employer, Ford Motor Company,
to be vaccinated and was vaccinated at the company's plant
by a doctor employed by the Ford Motor Company. As an
effect of said vaccination· the employee incurred a strepto-
coccus poisoning, the focus of the infection being the vac-
cinated arm, and as a concequence the employee died of a
streptococcus poison. There was testimony that the employ-
er was requested by the Detroit Board of Health to have
its employees vaccinated against smallpox. The employer
contended that the vaccination was not an accident and that
if the infection was an accident, there was no proof that
the germs entered the wound at the time of vaccination or
during the time deceased was at work. In disposing of this
contention the Court said: "It may be conceded that the
vaccination wound was not an accident because it was not
an 'unforeseen event.' But vaccination is usually harmless,
and, under the above authorities, infection · therefrom is
an accident. Of course, no one could testify that he saw a
germ enter the wound. The most that could be done would
be to tell the condition which would render infection prob-
able or possible. No testimony was introduced to indicate
how or when the infection did or could have occurred or its
cause. The only cause, time, and place indicated in the rec-
ord are found in the concession in the statement of facts,
that the infection was an effect of the vaccination. This con-
cession ties the accident of infection to the act of vaccina-
tion as occurring in the course of the employment." In dis-
tinguishing this case from its previous decision in *Krout
v. J. L. Hudson Co., supra,* the Court said: "The case at bar
is readily distinguishable from the *Krout case.* There the
vaccination was by a public agency, independent of the em-
ployer and employment. Here the vaccination was performed
by defendant's physician, was suffered by the employee un-
der direct order of defendant, neither the employee nor de-

fendant was under the compulsion of public authorities, but defendant was acting in a merely discretionary compliance with a request. The vaccination occurred in the course and out of the employment."

In *Texas Employers' Ins. Ass'n v. Mitchell,* Tex. Civ. App., 27 S. W. (2d), 600, 603, it appeared that the employer ordered all of its employees to be vaccinated on account of a prevailing smallpox epidemic but this was not done at the request of a board of health. The employees were told that if they failed to comply with this request, they would not be allowed to work in the plant until after the epidemic had passed. The costs of the vaccination were borne by the employees. The claimant was vaccinated and an infection followed which rendered her permanently disabled. An award for compensation in her favor was upheld. In holding that the vaccination was an accidental injury, the Court said: "The [very] act of vaccination itself cannot be said to have been an 'accident' in the ordinary sense of the word, as it was foreseen, expected, and intended. Mrs. Mitchell went to the doctor's office for that very specific purpose. But the infection and its immediate entry into the system through the vaccination wound was the intervention of an unlooked for circumstance sufficiently constituting the element of accident. There was no intention to have the wound become infected. The vaccination wound and the infection following the vaccination combined to immediately cause and bring about the bodily injury. Therefore such injury would appear, and sufficiently so, to be an injury of accidental nature effected through accidental means."

The foregoing definition of the word "accident" as used in the Workmen's Compensation Act is in line with the meaning given that word by this Court in numerous decisions. *Layton v. Hammon-Brown-Jennings Co. et al.,* 190 S. C., 425, 3 S. E. (2d), 492; *Next of Kin of Clinton Cole v. Anderson Cotton Mills et al.,* 191 S. C., 458, 4 S.

E. (2d), 908; Strawhorn v. J. A. Chapman Construction Co. et al., 202 S. C., 43, 24 S. E. (2d), 116.

In Spicer Mfg. Co. v. Tucker, 127 Ohio St., 421, 188 N. E., 870, the syllabus by the Court is as follows: "An employee suffers an accidental injury arising out of and in the course of his employment when, during working hours, the employer, upon his own authority and for his own benefit, requires the employee to be vaccinated by the employer's physician, and the wound becomes infected, thereby causing death and disability."

Counsel have discussed at length the purpose of this vaccination and inoculation, appellants contending that it was to preserve the public health and respondents that it was promulgated for the benefit of the Authority and the contractors. The probable truth is that both motives were present. The costs were borne by the employer. The Industrial Commission was warranted in concluding that vaccination and inoculation were received in part at least as a precaution against suspension or interruption of the work through smallpox and typhoid fever. It can easily be perceived how a smallpox or typhoid epidemic could have seriously interrupted or suspended the work on this project, thereby materially delaying the completion of the job.

It is next contended that smallpox vaccination normally produces no injurious effects and that there is no evidence that the nurses or doctor were negligent in giving the vaccination. It is argued that the infection could have come from some cause wholly disconnected with the employment of deceased This contention is answered by the language of the Court in Neudeck v. Ford Motor Co., supra, which we have heretofore quoted. In disposing of a similar contention in Texas Employers' Ins. Ass'n v. Mitchell; supra, the Court said: "Injury through infection of a wound is generally classed as a compensable injury under the Compensation Law, in case the proof shows either that the infection

entering the wound was peculiarly incident to the work or character of business or that the wound or abrasion of the skin was actually received in the scope of the employment, and thereafter came in direct contact with some infectious or poisonous matter, although such poisonous matter be not traceable to the work or character of business of the employed."

In 39 A. L. R., page 872, the annotator cites numerous cases to support the following statement: "An external infection which has been distinctly traced to a definite point of contact, such as a scratch or abrasion, and to a definite time, being of an unusual nature and generally happening suddenly or unexpectedly, is generally held to constitute an accident, or an injury by accident, within the meaning of the act."

We think there is sufficient evidence to support the conclusion of the Industrial Commission that the infection of the vaccination wound was an accident which arose out of and in the course of deceased's employment and that the employer is liable under the Act for the death of the deceased resulting from such infection.

The final question raised by the exceptions relates to the amount of the award. Appellants contend that the total compensation under the award made by the Industrial Commission exceeds $6,000.00. This is true. Respondents concede that the total weekly payments cannot exceed $6,000.00, but contend that funeral expenses, not exceeding $200.00, may be awarded in addition to that amount. The question is not discussed or referred to in the order of the trial Judge and it is, therefore, doubtful whether it was brought to his attention. However, the question is argued by both sides as if properly raised.

Section 41 of the Act, Section 7035-44, Code of 1942, is as follows: "The total compensation payable under this

Act shall in no case exceed six thousand ($6,000.00) dollars." Section 2 of the Act, Section 7035-2, Code of 1942, under subdivision (k) defines compensation in the following language · "The term 'compensation' means the money allowance payable to an employee or to his dependents as provided for in this Act, and includes funeral benefits provided herein." We think it is clear under this definition that the funeral expenses are to be included in determining the total compensation allowed under the Act. In other words, the aggregate amount paid to the claimants, together with the allowance for funeral expenses, cannot exceed $6,000.00. These exceptions are sustained and the award accordingly modified.

All exceptions relating to the right of recovery are overruled.

The judgment below is modified in accordance with the foregoing views.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES FISHBURNE, STUKES and TAYLOR concur.