GUILLERMO ATILES MORÉU, MANAGER, ETC., Petitioner, *v.*
INDUSTRIAL COMMISSION OF PUERTO RICO, ETC., Respondent; LAURA OCASIO CHÁVEZ ET AL., Interveners.

No. 568. Decided April 25, 1962.

*Donald R. Dexter, Carmen Ana Archeval,* and *Ángel de Jesús Matos* for petitioner. *Antonio J. Amadeo* and *Santos P. Amadeo* for interveners.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

In the autumn of 1958, the Department of Health of Puerto Rico launched a campaign for the vaccination of the population for the purpose of preventing the spread of a smallpox epidemic which threatened to break out in the Island. To that effect, the Secretary of Health provided facilities for the inoculation of the vaccine virus and urged the citizens to submit to vaccination.[1] It is pertinent to state

---

[1] Section 29 of Act No. 81 of March 14, 1912 (Sp. Sess. Laws, p. 122), as amended by Act No. 156 of May 10, 1945 (Sess. Laws, p. 528; 24 L.P.R.A. § 353), provides that "The inoculation of vaccine virus is hereby declared *obligatory* and binding upon all the inhabitants of the Commonwealth during such period and under such form and interval of time as the Commissioner of Health (now Secretary of Health) may determine; the inoculation of any other organic, prophylactic, or therapeutic product in

that in accordance with § 8 of Regulations No. 46 of the Department of Health, promulgated on October 17, 1916, vaccination is compulsory for persons over 25 years of age "*on the outbreak of smallpox* in any part of Puerto Rico, which appears to threaten an epidemic." (Italics ours.) 24 R.&R. P.R. § 350–1608(d).[2]

Federico Gordo Martinó, an employee of the Division of Personal Property Tax of the Treasury Department,[3] died on October 6, 1958 and his death was attributed to "post-vaccinal meningo-encephalitis." His family requested the corresponding benefits provided in the event of accidents caused by any "act or function inherent in his work or em-

---

cases of epidemic being also *obligatory.*" (Italics ours.) The 1945 amendment consisted in eliminating a *Provided* clause requiring the express approval of the Insular Board of Health whenever it was deemed necessary to use virus or serum to combat an epidemic disease other than smallpox.

Section 1 of Act No. 157 of May 10, 1938 (Sess. Laws, p. 337; 24 L.P.R.A. § 354) provides that "Where by proclamation of the Governor of Puerto Rico an epidemic shall be declared to exist in one or several municipalities, the Insular Commissioner of Health, immediately upon such declaration of an epidemic, shall take charge of the municipal sanitation of such municipality or municipalities so affected." So far as we have been able to learn, the Governor had not declared the existence of an epidemic on the date referred to in this opinion.

[2] See, also, § 14 of the said regulations (24 R. & R.P.R. § 350–1614), which provides that as soon as the existence of cases of smallpox shall be verified in any house or any locality of the Island, *all persons* residing in said house and locality, no matter of what age, shall be vaccinated, unless they prove to entire satisfaction that they have been successfully vaccinated within a period of three years prior to the outbreak of smallpox.

A vaccination certificate is required of public-school teachers and employees, employees of railroads, tramways, vehicles at the service of the public, stevedores, proprietors, and clerks of hotels, restaurants, and other commercial establishments, managers and operatives of workshops and factories, policemen and applicants therefor, and of inspectors, *internal-revenue appraisers,* and employees whose occupation brings them in contact with the public. Sections 9 and 11 to 13 of the regulations *supra* (24 R.&R.P.R. §§ 350–1609 and 1611 to 1613).

[3] For the purposes of the administration of the Workmen's Accident Compensation Act, Act No. 45 of April 18, 1935 (Sess. Laws, p. 250; 11 L.P.R.A. § 1 *et seq.*), the insured employer in whose favor the policy involved herein was issued was the Treasury Department. The different departments and agencies of the Commonwealth purchase separate policies because the activities of their employees involve different risks, and the premiums therefore vary.

ployment when such accidents happen in the course of said work or employment and as a consequence thereof." The Manager of the State Insurance Fund held that it was not a compensable labor accident.

The only witness who testified at the hearing before the Industrial Commission was José Manuel López Somolinos, who on the date of the event which gave rise to the claim held the office of Acting Chief of the Office of Property Assessment, to which the division where the deceased worked was attached. The pertinent part of his testimony reads as follows:

"Q. You said that you were Acting Chief of that Office?
A. Yes, madam.
Q. Who was the person who gave the orders there? Was it you?
A. Yes, madam.
Q. Did you order at any time that the employees be vaccinated?
A. *Vaccination was not ordered.*
Q. Do you know how many persons were vaccinated?
A. I don't know who were vaccinated or who were not.
Q. *Did you tell them that if they were not vaccinated they could not continue in their work?*
A. *No, madam.* What is more, those who were vaccinated, I don't know if I urged them to be vaccinated.
Q. Do you know if the deceased workman, Federico Gordo, was vaccinated?
A. I don't know.
Q. Do you know of any persons who were not vaccinated?
A. Yes, because they did not submit to vaccination after Gordo's incident. I know of some who were not vaccinated.
Q. *Was there any problem in the work with the persons who were not vaccinated?*
A. *No problem at all.*

.      .          .        .        .        .        .

Lic. Amadeo:
Q. In answer to a question made by the colleague you said that there was a government campaign to prevent an epidemic, or that you had heard about it?

A. There was a campaign, or whatever it was; the comment was that you had to be vaccinated, that there was an epidemic.

Q. As acting chief of the division, are you interested or not in that the entire personnel work every day?

LIC. ARCHEVAL:

We object. It is immaterial and irrelevant, because all employers want their employees to come to work.

LIC. AMADEO:

You were interested in that the epidemic which will break out in the Island would not affect the personnel of the division where you work?

A. *That it would not occur in the whole Island in general.* To humanity as a whole, I wish it would not occur.

Q. That is, that as direct superior and employer of workman Federico Gordo you were interested in that an epidemic would not occur there? Right?

A. I was not thinking one way or another.

Q. But you were interested in that there would be no epidemic.

LIC. ARCHEVAL:

Objection. He has already answered that he was not thinking whether or not there was an epidemic.

A. We were not interested at all in the epidemic.

LIC. AMADEO:

Are you interested in the good health of your entire personnel?

A. *Everybody is interested.*

Q. *Because if everybody comes to work, you can perform your administrative functions better.*

A. *Yes...*

LIC. AMADEO:

That's all with the witness." (Italics ours.)

The Industrial Commission held that the accident was compensable, and in its order stated that on cross-examination the witness had said that "he was interested in the attendance of all the employees of his division; that he was interested in the good health of his employees since it would cut down the absences; that he did not wish any of his employees to get sick nor that a smallpox epidemic would break out in the Island." Because of the importance in the deci-

214

sion of the case, it is necessary to point out that this summary of the witness' testimony on cross-examination does not correspond exactly with the testimony given, as it appears in the transcript attached to the record. The discrepancies are important and decisive. Let us see. It appears from the transcript that López Somolinos did not answer the question put to him—because of the objection raised by the attorney for the Manager of the State Insurance Fund—on his interest in the daily attendance of the employees. He did not say that he was interested in the good health of the subordinates, "since it would cut down the absences," but merely said when asked "Are you interested in the good health of your entire personnel?", that "Everybody is interested"; nor did he emphasize, as set forth in the order appealed from, that "he did not wish any of his employees to get sick," since he merely stated that the epidemic would not break out "in the whole Island in general." Nor can we attribute such a decisive scope to his affirmative answer to the conclusion contained in the affirmation, purely argumentative, of the attorney for the claimants that "if everybody comes to work, you can perform your administrative functions better." Evidently, when the witness answered in the affirmative and attempted to explain—a fact evidenced by the leaders following the affirmation "Yes"—he was interrupted by the announcement on the termination of the cross-examination. It is also significant that the question did not refer at all to the existence of an epidemic, and that the proper answer—even from the purely humanitarian point of view—seems foolish. Truly, on such a flimsy and insufficient evidence the determination of compensability made by the Industrial Commission could not be reached.

█ It may be affirmed that the determination of the compensable character of an accident resulting from the vaccination of an employee depends on the following elements: (1) the voluntary character of the inoculation, namely,

whether the act was performed at the request and by direction of the employer, or whether it is an optional act of the workman, even though there was a recommendation of the employer in co-operation with the health authorities; (2) whether the vaccination is taken for the benefit of the employer, or at his request; (3) whether vaccination is administered in pursuance of a statute or regulation as a condition for obtaining or retaining the employment. Such is the inference from the opinions in which it has been held that the accident is not compensable—*King* v. *Arthur*, 96 S.E.2d 846 (N.C. 1957); [4] *Industrial Commission* v. *Messinger*, 181 P.2d 816 (Colo. 1947); *Smith* v. *Seamless Rubber Co.*, 150 Atl. 110 (Conn. 1930); *Jefferson Printing Co.* v. *Industrial Commission*, 144 N.E. 356 (Ill. 1924); *Krout* v. *J. L. Hudson Co. et al.*, 166 N.W. 848 (Mich. 1918)—as from those in which a contrary view was adopted—*Roberts* v. *U.S.O. Camp Shows Inc.*, 205 P.2d 1116 (Cal. 1949); *Saintsing* v. *Steinbach Co.*, 64 A.2d 99 (N.J. 1949); *Freedman* v. *Spicer Manufacturing Corporation*, 116 Atl. 427 (N.J. 1922); *Alewine* v. *Tobin Quarries*, 33 S.E.2d 81 (S.C. 1945); *Smith* v. *Brown Paper Mill Co.*, 152 So. 700 (La. 1934); *Spicer Manufacturing Co.* v. *Tucker*, 188 N.E. 870 (Ohio 1934); *Texas Employers' Ins. Ass'n* v. *Mitchell*, 27 S.W.2d 600 (Texas 1930); *Neudeck* v. *Ford Motor Co.*, 229 N.W. 438 (Mich. 1930); *Sanders* v. *Children's Aid Society*, 265 N.Y. Supp. 698 (1933).

LARSON [5] discusses the question in the following language:

"When inoculation is the result of any element of compulsion emanating from the employer, resulting disability is deemed to arise in the course of employment, as when the company requires the employee to submit to vaccination by the company's doctor as soon as he is hired, or during an epidemic tells his workers that unless they are vaccinated they can not work. until the epidemic is over.

---

[4] See commentary in 56 Mich. L. Rev. 664 (1958).

[5] 1 LARSON, The Law of Workmen's Compensation 416–18, § 2732 (1952 ed.).

"On the other hand, if the compulsion comes from state law or public authority, the injury is not compensable, as when regulations of a state board of health require that waitresses undergo a blood test...

"The closest situations are those in which the pressure applied by the employer falls short of compulsion and amounts only to urging. At least two cases have held that the combination of strong encouragement by the employer plus an element of mutual benefit in the form of lessened absenteeism and improved employee relations is enough to supply the necessary link with the employment. In *Saintsing* v. *Steinbach Company*, during a smallpox scare, the employer's personnel director, after a meeting with other employer representatives in the area, persuaded the employer to provide vaccination service to all his employees. Vaccine was purchased through the local Department of Health, and vaccination was made available to all employees without charge. A notice was posted, saying, ' . . . we strongly urge that you take advantage of this service, which we are glad to provide in the interest of your health.' Each employee signed a paper releasing the employer from any liability for the results of the inoculation. Claimant suffered a severe reaction to the vaccination. The court found a mutual benefit here, comparable to that in the provision of cafeteria service, first aid, and other conveniencies to promote morale and efficiency among employees. The court said:

" ' . . . insofar as it aided in the prevention of smallpox within the employee group it protected the employer against possibly disastrous business consequences... While his efforts were highly commendable... it would be unrealistic to find that they were for the exclusive benefit of the employees and not additionally designed to further a sound employer-employee relationship and safeguard the employer against the serious effects of a case of smallpox amongst its employees.'

"*Smith* v. *Brown Paper Mill Company* is directly in accord with this holding. The workmen were not 'ordered or required' to take the inoculation, but, said the court:

'the convenience of the facility and the posted notice constituted a suggestion, an invitation and urge, calculated to induce an employee to submit to the treatment who might not otherwise have done so.'

"There was evidence here that one reason the employer urged the inoculation was to reduce its insurance rates and cut down time loss due to disease. The injections were made by a trained nurse on the staff of the employer, and were given on the premises because otherwise the employees would have had to go to a point five miles away.

"It appears to be a safe conclusion, then, that when an employer furnishes and urges inoculation, injury therefrom will be compensable, unless the real impetus comes from public laws or authorities."

■ SCHNEIDER[6] sums up the applicable rule in the following terms:

"Where an employer provides without charge the facilities for vaccinating or inoculating its employees against the spread of some contagious disease, and invites its employees to make use of such facilities on company time on a voluntary basis, with no penalty attached, and no question of compulsion involved, the compensability of any illness or disability resulting from the vaccination or inoculation depends upon whether the act of the employer in providing the facilities was intended solely for the accommodation and exclusive benefit of the employee, or was for the mutual benefit of the employer and employee. If it is the former, compensation will be denied. If it is the latter, compensation should be awarded. *The intention of the employer is of prime importance.*" (Italics ours.)

The reference in HOROVITZ, Injury and Death Under Workmen's Compensation Laws 90 (1948 ed.), has no direct relation to the problem in issue, for it only considers the vaccination or inoculation for the purpose of determining whether or not it is an "accident."[7]

In all cases in which compensation has been allowed the facts show conclusively that the inoculation was at least urged by the employer, or that the latter derived some special

---

[6] 7 SCHNEIDER, Workmen's Compensation Text 358, § 1674 (3d ed. 1950).

[7] The citation referred to reads: "When the employer compels or provides *vaccination or antitoxin treatment*, and harm results, the resulting injury is usually considered 'by accident,' as the unfortunate result is unexpected and unforeseen." (Italics in the text.)

benefit from such act. Thus, in *Saintsing* v. *Steinbach Co.*, 64 A.2d 99 (N.J. 1949), relied on with unusual interest by the representatives of the claimants at the hearing, it was established that the employer provided the facilities for the inoculation against smallpox and distributed a notice to the employees which read, "We are sure that everyone is aware of the current spread of smallpox and we strongly urge that you take advantage of this service, which we are glad to provide in the interest of your health"; that this measure providing facilities was designed to improve the employer-employee relationship, as testified by the enterprise's personnel director; and that it was also intended for the benefit of the employer. In *Freedman* v. *Spicer Manufacturing Corporation*, 116 Atl. 427 (N.J. 1922), the employer obtained and administered through its company physician a vaccine to its employees, and although the program was voluntary, "he invited, recommended and induced" the employees to accept such service. In *Sanders* v. *Children's Aid Society*, 265 N.Y.Supp. 698 (1933); *Neudeck* v. *Ford Motor Co.*, 229 N.W. 438 (Mich. 1930), and *Roberts* v. *U.S.O. Camp Shows Inc.*, 205 P.2d 1116 (Cal. 1949), there was a request and express order of the employer to the employee to undergo vaccination. *Smith* v. *Brown Paper Mill Co.*, 152 So. 700 (La. 1934), not only considered that the employer provided the vaccination facilities and urged the employees to take advantage of that, but that the employer derived a benefit from the payment of a lower premium when the incidence of the disease was less. In *Spicer Manufacturing Co.* v. *Tucker*, 188 N.E. 870 (Ohio 1934), it was established that although vaccination was optional, the employer would suspend those employees who did not submit to vaccination so that the normal manufacturing operations of the plant would not be affected by a quarantine. The same view is held in *Texas Employers' Ins. Co.* v. *Mitchell*, 27 S.W.2d 600 (Texas 1930). *Alewine* v. *Tobin Quarries*, 33 S.E.2d 81 (S.C. 1945), was

decided on the ground that the vaccination certificate was necessary as a condition for retaining the employment and on the particular circumstances of the latter.

■ From the evidence heard before the Industrial Commission it appears clearly that the deceased submitted voluntarily to vaccination, without compulsion by his immediate superiors, but rather in response to the urge made to all citizens; that the employee's voluntary act did not inure a *special benefit* to his employer, since it was merely intended to prevent his personal absence from the daily work in the event the immunization were successful, and that vaccination was not a condition for continuing in the employ. The facts which the evidence does not reveal and which have been considered by other courts in making determinations of compensability are: (a) availability by the employer of inoculation facilities—the transcript is devoid of any evidence showing where and when the deceased received the inoculation, if in the offices proper and during working hours, whether he was permitted to absent himself during working hours for such purpose, whether the vaccination was administered by a private physician or by a physician in the service of the public in general, or especially provided by the employer for such work; (b) invitation or urgent recommendation of the employer to submit to inoculation—there is nothing to show whether the deceased accepted the invitation made by the public-health authorities to the entire community, or whether it was at the employer's urge, either through a circular or a notice posted on the bulletin board of the office; (c) specific form in which the work would be affected and imminent risk of a stoppage; (d) existence of a greater risk by reason of the functions discharged by the employee than the risks to which the public in general was exposed. On the other hand, everything seems to indicate that the vaccination program was intended to comply with the dictates of the local legislation in order to prevent the spread of epidemics to which

reference has been made at the outset of this opinion. Although the concurrence of all the elements of proof which we have mentioned is not necessary, the evidence should show at least some causal relation between the accident and the employment, namely, that the act of vaccination constituted a risk incidental to the employment. In the instant case this relation was not satisfactorily established.

■■ Ordinarily we would dispose of this case by setting aside the order of the Industrial Commission. However, since there is involved a statute the fundamental purpose of which is a social benefit, and not being satisfied that the claimants had a real opportunity to establish the causal relation between the indubitable fact of the death resulting from the vaccination and the employment, we will remand the record for the holding of a new hearing and the formulation of additional findings of fact. We do not wish to forego this opportunity to urge the Commission not to confine its intervention in these proceedings merely to the reception of evidence, and that a greater intervention is desirable because of its superior knowledge on the matter, thereby preventing a possible worthy claim from being successful through the inadvertence or excusable negligence of the petitioner. In construing the statute, that agency should be guided by a liberal attitude in order to accomplish the purposes which inspired the lawmaker and which he statutorily consecrated by indicating, as a rule of construction, that "This act, being of a remedial character, shall be construed liberally, and any reasonable doubt that may arise as to its application with regard to the existence of causal relation between the work or occupation of the workman or employee and the injury, disability or death... shall be decided in favor of the workman or employee, or his beneficiaries." Section 2 of the Workmen's Accident Compensation Act, as amended by Act No. 94 of June 22, 1957 (Sess. Laws, p. 439; 11

L.P.R.A. § 2, 1960 Supp., p. 6). See *Candelaria* v. *Industrial Commission, ante,* p. 18, and *Meléndez* v. *Industrial Commission, ante,* p. 54.

The order entered by the Industrial Commission on April 27, 1959, will be set aside and the case remanded for further disposition consistent with this opinion.

Mr. Chief Justice Negrón Fernández dissented.