GUILLERMO ATILES MOREU ETC., recurrente, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO ETC., demandada; LAURA OCASIO CHAVEZ Y BERNARDO GORDO CHAPERO, interventores.

*Número: 568. Resuelto: 25 de abril de 1962.*

*·· Donald R. Dexter, Carmen Ana Archeval y Angel de Jesús Matos,* abogados del recurrente; *Antonio J. Amadeo y Santos P. Amadeo,* abogados de los interventores.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Dávila.

El Juez Asociado Señor Blanco Lugo emitió la opinión del Tribunal.

En el otoño del año 1958 el Departamento de Salud de Puerto Rico desarrolló una campaña para la vacunación de la población a los fines de evitar la propagación de una epidemia de viruelas que amenazaba con atacar a la Isla. Al efecto, el Secretario de Salud proveyó facilidades para la inoculación del virus vacuno y se exhortó a los ciudadanos a vacunarse.[1]

---

[1] El artículo 29 de la Ley Núm. 81 de 14 de marzo de 1912, págs. 135-136, según enmendado por la Ley Núm. 156 de 10 de mayo de 1945, pág. 535 (24 L.P.R.A. sec. 353) provee que "La inoculación del virus vacuno se declara por la presente *obligatoria* para todos los habitantes de la Isla, en la época, forma y plazo que determinare el Comisionado de Sanidad [hoy

Es pertinente indicar que de conformidad con el artículo 8 del Reglamento Núm. 46 del Departamento de Salud, sobre vacunación, promulgado en 17 de octubre de 1916, se requiere la vacunación obligatoria a las personas mayores de 25 años *"cuando apareciere* en alguna localidad de Puerto Rico *la viruela,* en forma que amenazare hacerse epidémica." (Bastardillas nuestras.) 24 R. & R.P.R. sec. 350–1608 (d).(²)

Federico Gordo Martinó, empleado en la División de Tasación de Bienes Muebles del Departamento de Hacienda,(³) falleció el día 6 de octubre de 1958, atribuyéndose la muerte a una "meningo encefalitis post vacuna". Sus familiares soli-

Secretario de Salud]; siendo también *obligatoria* en los casos de epidemia, la inoculación de cualquier otro producto orgánico profiláctico o terapéutico." (Bastardillas nuestras.) La enmienda de 1945 consistió en eliminar un "Disponiéndose" que requería la aprobación expresa de la Junta Insular de Sanidad cuando se estimaba necesario emplear virus o sueros para combatir una enfermedad epidémica que no fuera la viruela.

La sección 1 de la Ley Núm. 157 de 10 de mayo de 1938, pág. 352 (24 L.P.R.A. sec. 354) dispone que "Cuando una epidemia sea declarada en uno o varios municipios, mediante proclama del Gobernador de Puerto Rico, el Comisionado Insular de Sanidad se hará cargo inmediatamente a la declaración de la epidemia, de la sanidad municipal del o de los municipios afectados." Hasta donde hemos podido investigar, el Gobernador no declaró la existencia de epidemia para la fecha a que nos referimos en esta opinión.

(²) Véase además, el artículo 14 de dicho reglamento (24 R. & R.P.R. sec. 350-1614) que dispone que una vez conocida la existencia de casos de viruela en alguna casa o localidad, serán vacunadas *todas las personas,* sin tener en cuenta su edad, que residan en la casa y en la localidad, a menos que justifiquen de un modo satisfactorio que se vacunaron con éxito dentro de un período de 3 años con anterioridad a la aparición de la viruela.

Se requiere el certificado de vacuna a los maestros y empleados de escuelas públicas, empleados de ferrocarriles, tranvías, vehículos de transporte para el servicio público, estibadores, dueños y dependientes de hoteles, restaurantes y otros establecimientos de comercio, gerentes y operarios de talleres y fábricas, policías y aspirantes a policías, y a los inspectores, *tasadores de rentas internas* y empleados cuya ocupación les ponga en contacto con el público, Artículos 9 y 11 a 13 del reglamento citado (24 R. & R.P.R. secs. 350-160 y 1611 a 1613).

(³) Para los fines de la administración de la Ley de Compensaciones por Accidentes del Trabajo, Ley Núm. 45 de 18 de abril de 1935 (11 L.P.R.A. sec. 1 y ss.) el patrono asegurado a cuyo favor se expidió la póliza que está envuelta en este caso era el Departamento de Hacienda. Los distintos departamentos y agencias del Estado Libre Asociado obtienen pólizas separadas por la razón de que las actividades de sus empleados envuelven riesgos diferentes, y por tanto, las primas varían.

citaron se les extendieran los beneficios correspondientes provistos para el caso de accidentes que provienen de un "acto o función inherente a su trabajo o empleo y que ocurran en el curso de éste, y como consecuencia del mismo." El Administrador del Fondo del Seguro del Estado resolvió que no se trataba de un accidente del trabajo compensable.

El único testigo que prestó testimonio en el acto de la vista celebrada ante la Comisión Industrial fue José Manuel López Somolinos, quien para la fecha del suceso que dio origen a la reclamación ocupaba el cargo de Administrador Interino de la Oficina de Tasación de la Propiedad, a la cual estaba adscrita la división donde trabajaba el occiso. La parte pertinente de su declaración dice así:

"P. ¿Usted dijo que era Administrador Interino de esa División?

R. Sí señora.

P. ¿Quién era la persona que daba las órdenes allí? ¿Era usted?

R. Sí señora.

P. ¿Usted ordenó en algún momento que se vacunaran los empleados?

R. *No se ordenó la vacuna.*

P. ¿Sabe cuántas personas se vacunaron?

R. No sé cuáles se vacunaron o cuáles dejaron de vacunarse.

P. *¿Usted les dijo que si no se vacunaban no podían seguir trabajando?*

R. *No señora.* Es más, los que se vacunaron, no sé si se los dije que se vacunaran.

P. ¿Usted sabe si el obrero occiso Federico Gordo se vacunó?

R. No lo sé.

P. ¿Usted sabe si hubo personas que no se vacunaron?

R. Hubo, porque no se vacunaron después del incidente de Gordo. Tengo conocimiento de algunos que no se vacunaron.

P. *¿Hubo problema en el trabajo con las personas por no haberse vacunado?*

R. *Absolutamente ningún problema.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Lcdo. Amadeo:

P. A preguntas de la colega usted dijo que había una campaña del Gobierno para evitar una epidemia, o que había oído eso?

R. Si hubo campaña, o lo que hubo, hubo el comentario que había que vacunarse que había epidemia.

P. ¿Usted como jefe interino de la División le interesa, o no le interesa, que todo el personal vaya a trabajar todos los días?

Lcda. Archeval:

Vamos a levantar objeción. Es inmaterial e irrelevante, porque a todos los jefes les gusta que sus empleados vayan a trabajar.

Lcdo. Amadeo:

A usted le interesaba que la epidemia que va a ocurrir en la Isla no afecte al personal de la División donde usted trabaja?

R. *Que no ocurriera en toda la Isla en general.* A la humanidad entera, no quisiera yo que le ocurriera.

P. O sea, que a usted como jefe y patrono directo del obrero Federico Gordo, ¿le interesaba que no hubiera una epidemia allí? ¿Correcto?

R. Yo no estaba pensando en una cosa o la otra.

P. Pero le interesaba que no hubiera epidemia.

Lcda. Archeval:

Objeción. Ya él ha contestado que no estaba pendiente si había epidemia o no.

R. No teníamos interés alguno en la epidemia.

Lcdo. Amadeo:

P. ¿A usted le interesa que todo su personal esté en buena salud?

R. *A todo el mundo le interesa.*

P. *Porque si todo el mundo va a trabajar, usted puede descargar sus funciones administrativas mejor.*

R. *Sí...*

Lcdo. Amadeo:

Nada más con el testigo." (Bastardillas nuestras.)

La Comisión Industrial resolvió que se trataba de un accidente compensable, y en su resolución indicó que en la repregunta el testigo había manifestado que "estaba interesado en la asistencia de todos los empleados de su división; que le interesaba la buena salud de sus empleados puesto que ello disminuía las ausencias; que él no deseaba que ninguno de sus

empleados se enfermase ni que ocurriese una epidemia de viruelas en Puerto Rico." Por la importancia que tiene a los fines de resolver el caso, es necesario advertir que este resumen del testimonio del testigo en el contrainterrogatorio no corresponde exactamente con la declaración prestada según ésta aparece en la transcripción unida a los autos. Son importantes y decisivas las diferencias. Veamos. Según aparece de la transcripción el señor López Somolinos no respondió a la pregunta que se le formuló—por haberse objetado por la abogada que representaba al Administrador del Fondo del Seguro del Estado—sobre su interés en la asistencia diaria de los empleados; no indicó que le interesaba la buena salud de los subalternos " puesto que ello disminuía las ausencias", sino que se limitó a expresar al ser preguntado "¿A usted le interesa que todo su personal esté en buena salud?" que "A todo el mundo le interesa"; ni puntualizó como se hace aparecer en la resolución recurrida que "él no deseaba que ninguno de sus empleados se enfermase" ya que todo cuanto manifestó fue que no ocurriera la epidemia "en toda la Isla en general". Tampoco podemos darle un alcance tan decisivo a su contestación afirmativa a la conclusión que contenía la afirmación, puramente argumentativa del abogado de los reclamantes de que "si todo el mundo va a trabajar, usted puede descargar sus funciones administrativas mejor". Claramente cuando el testigo respondió en la afirmativa e intentó explicar—hecho comprobado por los puntos suspensivos que siguen a la afirmación "Sí"—fue interrumpido por el anuncio sobre la terminación del contrainterrógatorio. Además es significativo que la pregunta en forma alguna se refirió a la existencia de una epidemia, y que la contestación que requiere —aun desde el punto de vista puramente humanitario—raya en una perogrullada. Ciertamente con una prueba tan frágil e insuficiente no podía llegarse a la determinación de compensabilidad que hizo la Comisión Industrial. ■

Puede afirmarse que la determinación del carácter compensable de un accidente ocurrido con motivo de la vacunación de un empleado depende de los siguientes elementos: 1) el carácter voluntario de la inoculación, o sea, si el acto tuvo lugar a instancia y por órdenes del patrono, o si se trata de un acto voluntario del obrero, aunque mediara una sugestión del patrono en cooperación con las autoridades de sanidad; 2) si la vacunación se realiza para beneficio del patrono, o a su requerimiento; 3) si la vacunación se hace en cumplimiento de una ley o reglamento como condición para obtener o conservar el empleo. Así se deduce de las opiniones en que se ha sostenido que no se trata de un accidente compensable—*King v. Arthur*, 96 S.E.2d 846 (N.C. 1957) ; ([4]) *Industrial Commission v. Messinger*, 181 P.2d 816 (Colo. 1947) ; *Smith v. Seamless Rubber Co.*, 150 Atl. 110 (Conn. 1930) ; *Jefferson Printing Co. v. Industrial Commission*, 144 N.E. 356 (Ill. 1924) ; *Krout v. J. L. Hudson Co. et al.*, 166 N. W. 848 (Mich. 1918), como en aquellas en que se adoptó una posición contraria—*Roberts v. U.S.O. Camp Shows Inc.*, 205 P.2d 1116 (Cal. 1949) ; *Saintsing v. Steinbach Co.*, 64 A.2d 99 (N.J. 1949) ; *Freedman v. Spicer Manufacturing Corporation*, 116 Atl. 427 (N.J. 1922) ; *Alewine v. Tobin Quarries*, 33 S.E.2d 81 (S.C. 1945) ; *Smith v. Brown Paper Mill Co.*, 152 So. 700 (La. 1934) ; *Spicer Manufacturing Co. v. Tucker*, 188 N.E. 870 (Ohio 1934) ; *Texas Employers' Ins. Ass'n v. Mitchell*, 27 S.W.2d 600 (Texas 1930) ; *Neudeck v. Ford Motor Co.*, 229 N.W. 438 (Mich. 1930) ; *Sanders v. Children's Aid Society*, 265 N.Y.S. 698 (1933).

Larson([5]) discute la cuestión en las siguientes palabras:

"Cuando la vacunación es el resultado de cualquier elemento de apremio de parte del patrono, la incapacidad que de ella resulte se considera como que ha surgido en el curso del empleo, como

---

([4]) Véase, comentario en 56 Mich. L. Rev. 664 (1958).

([5]) *The Law of Workmen's Compensation*, (ed. 1952), vol. 1, sec. 2732, págs. 416-418.

cuando la compañía requiere al empleado que se vacune con el médico de aquélla tan pronto comienza su empleo, o cuando surge una epidemia y le informa a sus empleados que, a menos que se inoculen, no pueden trabajar hasta que cese le epidemia.

"Por otro lado, si la compulsión surge de las disposiciones de una ley estatal o de los requerimientos de las autoridades públicas, la lesión no es compensable, como en el caso en que por reglamentación una junta estatal de salud requiere que las camareras se sometan a un examen de sangre. . . .

"Los casos más dudosos son aquellos en que la intervención del patrono no impone a los empleados la obligación de vacunarse y se limita a sugerir su conveniencia. Por lo menos dos casos han resuelto que la combinación de una fuerte influencia de parte del patrono unida a un elemento de beneficio mutuo consistente en un menor número de ausencias, así como en mejores relaciones con los empleados, es suficiente para proporcionar la conexión necesaria con el empleo. En el caso de *Saintsing* v. *Steinbach Company*, durante un conato de viruelas, el director de personal del patrono, luego de reunirse con otros representantes patronales del área, persuadió al patrono para que proveyese servicio de vacunación a todos sus empleados. Se compraron éstas a través del Departamento de Salud local y se pusieron al alcance de todos los empleados, gratuitamente. Se publicó un aviso que decía, '. . .firmemente le instamos a que se aproveche de este servicio que gustosamente prestamos en beneficio de su salud.' Todos los empleados firmaron un documento exonerando al patrono de toda responsabilidad por los resultados de la vacuna. La corte resolvió que aquí existía un beneficio mutuo, comparable con el que existía en proveer una cafetería, primera ayuda y otras conveniencias a fin de promover la moral y la eficiencia entre los empleados. Dijo el tribunal:

'. . .en tanto en cuanto ayudó en la prevención de viruelas dentro del grupo de empleados, la vacuna protegía al patrono contra posibles consecuencias perjudiciales en el negocio. ... Si bien sus esfuerzos eran altamente encomiables. . .nos apartaríamos de la realidad si resolviéramos que estaban dirigidos al beneficio exclusivo de los empleados y no adicionalmente a mejorar la relación entre patrono y empleado y proteger al patrono contra los serios efectos de un caso de viruelas entre sus empleados.'

"El caso de *Smith* v. *Brown Paper Mill Company* está conteste con esta decisión. Los trabajadores no fueron 'ordenados o requeridos' a vacunarse, pero, dijo el tribunal:

'la conveniencia de las facilidades y la publicación del aviso constituyó una sugerencia, una invitación y un apremio, que tenía por miras inducir al empleado a someterse al tratamiento que de otra forma no hubiera recibido.'

"Hubo evidencia en este caso de que una de las razones por las cuales el patrono recabó la vacunación fue la de reducir sus tipos de seguros y aminorar el absentismo del trabajo debido a enfermedad de los empleados. Los empleados fueron inoculados por una enfermera debidamente entrenada que trabajaba para el patrono y las inyecciones fueron puestas en el local del patrono porque de otro modo los empleados hubieran tenido que recorrer cinco millas para recibirlas.

"La conclusión correcta parece ser que cuando un patrono proporciona y urge a sus empleados para que se vacunen, las lesiones provenientes de dicha vacunación serán compensables, a no ser que ésta responda al cumplimiento de la Ley o a los requerimientos de las autoridades."

Schneider [6] resume la regla aplicable en los siguientes términos: ■

"Cuando un patrono proporciana gratuitamente a sus empleados las facilidades para la vacunación o inoculación con miras a contrarrestar la propagación de una enfermedad contagiosa, y los invita a utilizar voluntariamente esas facilidades durante las horas de labor, sin que se les aperciba que serán sancionados si omitieran hacerlo, y sin que medie apremio alguno, la compensabilidad de la incapacidad o enfermedad que pueda sufrir el empleado depende de si el acto del patrono al proveer las facilidades obedeció al propósito de una conveniencia personal o para el beneficio exclusivo de dicho empleado, o para el beneficio común de ambos. Si se trata del primer caso, se negará la compensación. Si se trata del último, debe compensarse. *La intención del patrono es de importancia decisiva.*". . (Bastardillas nuestras.)

La referencia que aparece en Horovitz, *Injury and Death Under Workmen's Compensation Laws* (ed. 1948), pág. 90 no

---

[6] *Workmen's Compensation Text* (3a. ed. 1950), vol. 7, § 1674, pág. 358.

tiene relación directa con el problema discutido pues únicamente considera la vacunación o inoculación a los fines de determinar si se trata o no de un "accidente". ([7])

En todos los casos en que se ha concedido compensación los hechos demuestran concluyentemente que la inoculación fue cuando menos urgida por el patrono o que éste derivaba también algún beneficio especial de tal acto. Así, en *Saintsing* v. *Steinbach Co.*, 64 A.2d 99 (N.J. 1949), en que descansó con inusitado interés la representación de los reclamantes en la vista, se estableció que el patrono proveyó las facilidades para la inoculación contra las viruelas e hizo circular un aviso entre los empleados en el cual se decía "Estamos seguros de que ustedes están conscientes de la propagación de un brote de viruelas y les urgimos para que aprovechen este servicio que proporcionamos en interés de vuestra salud;" que esta medida de proveer facilidades fue tomada para mejorar las relaciones del patrono con sus empleados, según lo declaró el director del personal de la empresa; y que ello redundaba también en beneficio del patrono. En *Freedman* v. *Spicer Manufacturing Corporation*, 116 Atl. 427 (N.J. 1922) el patrono obtuvo la vacuna y destacó un médico de la compañía para que la administrara a los empleados y, aunque el programa era voluntario, "invitó, recomendó y urgió" a los empleados para que se aprovecharan del servicio brindado. En *Sanders* v. *Children's Aid Society*, 265 N.Y.S. 698 (1933) ; *Neudeck* v. *Ford Motor Co.*, 229 N.W. 438 (Mich. 1930) y *Roberts* v. *U.S.O. Camp Shows Inc.*, 205 P.2d 1116 (Cal. 1949) medió un requerimiento y orden expresa del patrono para que el empleado se vacunara. *Smith* v. *Brown Paper Mill*, 152 So. 700 (La. 1934) consideró no sólo que el patrono proveyó las facilidades de vacunación y urgió a los empleados

---

([7]) La cita a que nos referimos dice: "Cuando el patrono obliga al empleado a inocularse o provee para la vacunación o administración de los anticuerpos, y se ocasionan lesiones, éstas se consideran generalmente como causadas por un accidente, ya que este resultado es inesperado e imprevisto."

a hacer uso de las mismas, sino que el patrono se beneficiaba con el pago de una prima más baja cuando la incidencia de la enfermedad era menor. En *Spicer Manufacturing Co.* v. *Tucker*, 188 N.E. 870 (Ohio 1934) se demostró que aunque la vacunación era voluntaria, el patrono suspendería a los empleados que no se inocularan para evitar así que se declarara una cuarentena en el establecimiento perjudicando sus operaciones fabriles normales. En igual sentido se pronuncia *Texas Employers' Ins. Co.* v. *Mitchell*, 27 S.W.2d 600 (Texas 1930). *Alewine* v. *Tobin Quarries*, 33 S.E.2d 81 (S.C. 1945) se decidió a base de que el certificado de vacuna se requería como una condición para conservar el empleo y debido a las condiciones particulares de éste.

De la prueba practicada ante la Comisión Industrial surge diáfanamente que el occiso se vacunó voluntariamente, sin que mediara apremio de parte de sus superiores inmediatos, respondiendo más bien al llamado que se dirigió a toda la ciudadanía; que el acto voluntario realizado por el empleado no se traducía en un *beneficio especial* para su patrono, ya que se limitaba a que posiblemente se evitaría su ausencia personal de la labor diaria en caso de que la inmunización fuera satisfactoria, y que la vacunación no era una condición para continuar en el empleo. Los hechos que la prueba no revela, y que se han considerado por otros tribunales al rendir determinaciones de compensabilidad, son: a) suministro por el patrono de las facilidades para la inoculación—la transcripción está huérfana de toda prueba que demuestre dónde y cuándo el occiso recibió la inoculación, si en las propias oficinas y en horas de trabajo, si se le permitió ausentarse en horas laborables para ello, si la administración de la vacuna fue efectuada por un médico privado o uno al servicio del público en general o proporcionado especialmente por el patrono para esa labor—; b) invitación o reclamo urgente del patrono para la inoculación —nada hay que demuestre si el occiso respondió al llamado dirigido por las autoridades de salud pública a

toda la comunidad, o si fue a urgencia del patrono, bien mediante una circular o un anuncio en el tablón de edictos de la oficina; c) forma específica en que se afectaría el trabajo y riesgo inminente de una paralización del mismo; d) existencia de un riesgo mayor por mor de las funciones que desempeñaba el empleado que los riesgos a que estaba expuesto el público en general. Por otro lado, todo tiende a indicar que el programa de vacunación respondió a los dictados de la legislación local para evitar la propagación de epidemias a que hemos hecho referencia al comienzo de esta opinión. Aunque no es necesario que concurran todos los elementos de prueba a que hemos hecho referencia, cuando menos la evidencia debe demostrar alguna relación de causalidad entre el accidente y el empleo, o sea que el acto de la vacunación constituía un riesgo incidental del trabajo. En el presente caso no se estableció satisfactoriamente esta relación. 

Ordinariamente dispondríamos de este caso mediante la revocación de la resolución dictada por la Comisión Industrial. Sin embargo, por tratarse de un estatuto que responde fundamentalmente a un fin de beneficio social y no estando satisfechos de que los reclamantes tuvieron una oportunidad verdadera para establecer la relación causal entre el hecho indubitado de la muerte debido a la vacunación y el empleo, devolveremos el expediente para la celebración de una nueva vista y la formulación de determinaciones de hecho adicionales. No deseamos dejar pasar esta oportunidad para instar a la Comisión para que su participación en estos procedimientos no se limite meramente a recibir la prueba y que es deseable su mayor intervención, debido a su conocimiento superior sobre la materia, para evitar así que una posible reclamación meritoria naufrague debido a la inadvertencia o negligencia excusable de la parte peticionaria. En la interpretación del estatuto dicho organismo debe guiarse por una actitud liberal de forma que se logren los propósitos que animaron al legislador, y que, consagró estatutariamente al indicar como regla

de hermenéutica que "Esta ley por ser de carácter remedial se interpretará liberalmente, y cualquier duda razonable que en su aplicación surgiere en cuanto a la existencia de relación causal entre el trabajo u ocupación del obrero o empleado o la lesión, incapacidad o muerte . . . deberá resolverse a favor del obrero o empleado, o sus beneficiarios." Art. 2 de la Ley de Compensaciones por Accidentes del Trabajo, según enmendado por la Ley Núm. 94 de 22 de junio de 1957 (Leyes, pág. 473, 11 L.P.R.A. (Supl. 1960) pág. 6). Véanse, *Candelaria* v. *Comisión Industrial*, 85 D.P.R. 20 (1962) y *Vda. de Cabrera* v. *Comisión Industrial*, 85 D.P.R. 58 (1962).

*Se revocará la resolución dictada por la Comisión Industrial en 27 de abril de 1959, y se devolverá el caso para ulterior disposición según aparece en esta opinión.*

El Juez Presidente Sr. Negrón Fernández disintió.