VIRGILIO PACHECO PIETRI y OTROS, demandantes y recurrentes, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO y OTROS, demandados y recurridos.

*Número:* RE-89-524 *Resuelto:* 30 de junio de 1993

908

*Harry N. Padilla Martínez*, abogado de los recurrentes; *Jorge E. Pérez Díaz, Procurador General, Norma Cotti Cruz, Subprocuradora General*, y *Sylvia A. Cancio Bigas, Procuradora General Auxiliar*, abogados de El Pueblo.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Por estar ante una reclamación de daños por angustias mentales y morales que emanan de la ocurrencia de un accidente del trabajo, le es aplicable a los hechos de este caso la disposición de remedio exclusivo del Art. 20 de la Ley de Compensaciones por Accidentes del Trabajo, Ley Núm. 45 de 18 de abril de 1935 (11 L.P.R.A. sec. 21).

# I

*Los hechos*

A continuación haremos una breve síntesis de los hechos pertinentes, según éstos surgen de los documentos que acompañaron la moción de sentencia sumaria de la parte demandante y la correspondiente oposición de la parte demandada. El codemandante Virgilio Pacheco Pietri trabajaba como oficial de custodia en la Administración de Corrección. Como parte de su empleo, y a tenor con lo dispuesto en la Orden Ejecutiva Núm. 4784 de 9 de octubre de 1986, se le requería someterse a pruebas de orina para detectar la presencia de sustancias controladas. Esta Orden Ejecutiva asignó la función de obtener y analizar las muestras de orina a otra agencia del Estado, el Instituto de Ciencias Forenses (en adelante Instituto). Fue precisamente en el cumplimiento con este requisito, exigido por la naturaleza de su trabajo, que ocurrió el accidente que produjo los daños alegados en la demanda.

El 2 de febrero de 1988, los funcionarios del Instituto fueron al Campamento Penal El Limón, área de trabajo del codemandante Pacheco Pietri, y le tomaron una muestra de orina. Luego de hacer el correspondiente análisis, al consignar el resultado en el expediente del codemandante Pacheco Pietri, otro empleado del Estado, un funcionario del Instituto, se equivocó y anotó en dicho expediente el resultado del análisis de orina de otro empleado. Este análisis había arrojado positivo a cocaína, mientras que el resultado de la muestra de orina del codemandado Pacheco Pietri había sido negativo. Como consecuencia de este error, se tomaron contra Pacheco Pietri una serie de medidas administrativas, entre ellas, el someterlo a tratamiento en el Departamento de Servicios Contra la Adicción.

El Art. 11 del Reglamento del Programa Permanente para la Detección de Sustancias Controladas en Funciona-

rios y Empleados de la Administración de Corrección de 1ro de mayo de 1987, dispone los derechos de los participantes de dicho programa.

ARTICULO 11—DERECHOS DE LOS PARTICIPANTESA

a. Se le advertirá a cada funcionario o empleado que de así solicitarlo, se le entregará parte de la muestra obtenida, siempre que la misma exceda el mínimo necesario para realizar la prueba.

b. El funcionario o empleado que se someta a una prueba para detectar la presencia de sustancias controladas, tendrá derecho a obtener copia del informe que contenga el resultado del análisis de la muestra obtenida en dicha prueba.

c. Cuando se obtenga un resultado positivo corroborado, el funcionario o empleado concernido tendrá derecho a solicitar una vista administrativa para impugnar dicho resultado y presentar prueba para demostrar que no ha usado ilegalmente sustancias controladas.

Una vez confrontado con el supuesto análisis positivo de su muestra de orina, el codemandante Pacheco Pietri le informó a la Administradora de Corrección que se habían equivocado. También, en el ejercicio de su derecho, según dispone el Art. 11(a) del Reglamento del Programa Permanente para la Detección de Sustancias Controladas en Funcionarios y Empleados de la Administración de Corrección de 1ro de mayo de 1987, requirió que le suministrasen parte de la muestra de orina para someterla a un análisis independiente por un laboratorio privado.[1] Mediante Carta de 26 de abril de 1988, la Administradora de Corrección le informó que la petición debía ser dirigida al Dr. Pío R. Rechani, Director Ejecutivo del Instituto de Ciencias Forenses, lugar donde se realizó el análisis.

A principios de mayo, el abogado del señor Pacheco Pietri se comunicó telefónicamente con el doctor Rechani para que pusiera a su disposición parte de la muestra de orina en cuestión. El doctor Rechani se negó a entregar la mues-

---

[1] El codemandante pidió la muestra de orina mediante dos (2) cartas suscritas por su abogado, de 23 de marzo y 19 de abril de 1988.

tra solicitada. No obstante, el 10 de mayo, el doctor Rechani le envió a la representación legal de Pacheco Pietri una comunicación mediante la cual le informaba que, luego de hacer una investigación, había efectivamente corroborado que se cometió un error involuntario en su caso. Las muestras se habían confundido por error de algún empleado del Instituto.([2]) El empleado erróneamente consignó la información de la muestra de orina Núm. *11969*, que había arrojado positivo a cocaína, en el expediente Núm. *12969* del codemandante Pacheco Pietri.

Así las cosas, los demandantes recurrentes presentaron acción en daños y perjuicios contra el Estado Libre Asociado de Puerto Rico, la Dra. Mercedes Otero de Ramos, Administradora del Departamento de Corrección, y el doctor Rechani. Alegaron que la parte demandada había actuado de "forma negligente, descuidada y demostrando un absoluto menosprecio, por la salud, dignidad, reputación, trabajo y moral del codemandante Virgilio Pacheco Pietri al manejar la muestra de orina". Además, alegaron que como consecuencia de esta negligencia sufrieron daños emocionales y angustias mentales por la suma de sesenta mil dólares ($60,000).

Luego de una serie de trámites procesales, la parte demandante presentó una solicitud para que se dictase sentencia sumaria parcial con respecto a la controversia de la negligencia. Acompañó esta solicitud con una serie de documentos. El Estado se opuso y también acompañó varios documentos con su oposición. Una vez considerada la moción de sentencia sumaria, la oposición y los documentos que se acompañaron, el foro de instancia dictó resolu-

---

([2]) El doctor Rechani también le envió una carta al codemandante Pacheco Pietri en la cual le informó:

"Debido a un error involuntario, se informó la muestra número 12969, para detectar sustancias controladas como correspondiente al Sr. Virgilio Pacheco Pietri, placa 1142. En realidad el número correcto de la muestra que se analizó y resultó positivo fue otra muestra con un número similar.

"Incluyo fotocopia del resultado de la muestra 12969 correspondiente a usted, en la cual se determinó que no había ninguna clase de sustancia controlada."

ción en la que declaró con lugar la solicitud de sentencia sumaria parcial en cuanto al aspecto de negligencia.

Posteriormente, las partes sometieron unos extensos memorandos de derecho en los cuales discutieron la aplicación del remedio exclusivo del Art. 20 de la Ley de Compensaciones por Accidentes del Trabajo, *supra*. Como resultado de la evaluación de estos planteamientos, el tribunal reconsideró su resolución que determinó la negligencia y dictó sentencia en la que desestimó la demanda. Resolvió que, como cuestión de derecho, el accidente en controversia estaba cubierto por la disposición de remedio exclusivo del Art. 20, *supra*.

Inconforme con esta determinación, la parte demandante presentó un recurso de revisión, planteando como único error el que se "dictaminara que la acción de negligencia incurrida por el demandado está cobijada por el Artículo 20".

II

*Principios generales sobre accidentes del trabajo cubiertos por la Ley de Compensaciones por Accidentes del Trabajo*

El esquema de seguro compulsorio establecido por la Ley de Compensaciones por Accidentes del Trabajo va dirigido a proveerle a los obreros que sufren alguna lesión o enfermedad que ocurra en el curso del trabajo y como consecuencia del mismo, un remedio rápido, eficiente y libre de las complejidades de una reclamación ordinaria en daños. El sistema de protección social establecido le provee de inmediato al obrero lesionado apoyo económico y tratamiento médico adecuado y, además, coloca la carga por el sostenimiento financiero del mismo sobre los patronos. Para acogerse a los beneficios que provee el Fondo del Seguro del Estado (en adelante el Fondo), el obrero no tiene que probar que hubo negligencia de parte del patrono. Tampoco es impedimento para quedar cobi-

jado bajo la ley que el accidente haya ocurrido como consecuencia de la negligencia del obrero. A cambio de esta protección, el obrero renuncia a su derecho a traer contra el patrono asegurado la acción en daños que emana del acto negligente del patrono que ocasionó dichos daños. Art. 20, *supra*. Este quid pro quo es el eje central del esquema de seguro compulsorio; es lo que lo hace viable. *Ruiz Díaz v. Vargas Reyes*, 109 D.P.R. 761 (1980).[3]

Ahora bien, el que un obrero sufra una lesión como consecuencia de un accidente del trabajo y esté cobijado por la ley, no necesariamente entraña el que dicha lesión sea compensable. Aunque la ley provee *asistencia médica* independientemente de que se produzca o no una incapacidad o la muerte, ésta sólo dispone el beneficio de compensación para lesiones que produzcan incapacidades, sean éstas transitorias, parciales permanentes, totales permanentes o la muerte.[4] Art. 3 de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 3.

A tenor con lo dispuesto en el Art. 2 de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A.

---

[3] En *Ruiz Díaz v. Vargas Reyes*, 109 D.P.R. 761, 763–764 (1980), expresamos que:

"El principio de seguro exclusivo y de inmunidad del patrono, ancla de la Ley ... surgió como remedio de justicia social para la indefensión del trabajador en un naciente régimen industrial que conjugaba la libre aceptación de un trabajo, conocidas la peligrosidad del empleo o las precarias condiciones de seguridad ofrecidas por el patrono, con la asunción del riesgo por el obrero, sin acción reparadora de clase alguna. Para un hombre impulsado por la urgente necesidad de atender a la subsistencia de su familia, y a la suya propia, la aceptación de un trabajo era acto en que 'su pobreza y no su voluntad consentía'. El remedio a esta situación se desarrolló en un concepto de responsabilidad estricta o absoluta del patrono que eliminó las defensas de negligencia contribuyente, asunción de riesgo y negligencia del compañero de trabajo, a modo de 'compromiso bajo el cual el trabajador acepta una compensación limitada, generalmente inferior a la que un [juez] concedería por sus daños, a cambio de la ampliada responsabilidad del patrono, y la seguridad de que sería pagado' con la correlativa inmunidad del patrono acogido al estatuto de seguro. La exclusividad del remedio está declarada en el Art. 20 de la Ley, 11 L.P.R.A. sec. 21, al ordenar que siempre que el patrono asegure sus obreros y empleados, el derecho de compensación provisto en el estatuto será el único remedio en contra del patrono." (Énfasis y escolios omitidos.)

[4] "Incapacidad" se define como la "inhabilidad por lesión o enfermedad para desempeñar su trabajo habitual o cualquier otro trabajo". 11 L.P.R.A. sec. 202(g).

sec. 2, y su jurisprudencia interpretativa, quedan cubiertos bajo las disposiciones de dicha ley todos los obreros o empleados "que sufran lesiones o se inutilicen, o que pierdan la vida por accidentes que provengan de cualquier acto o función inherente a su trabajo o empleo y que ocurran en el curso de éste y como consecuencia del mismo o por enfermedades o muerte derivadas de la ocupación, según se especifican" en la ley. *Santiago Hodge v. Parke Davis Co.*, 126 D.P.R. 1 (1990); *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985); *Admor., F.S.E. v. Comisión Industrial*, 101 D.P.R. 56 (1973); *Cardona v. Comisión Industrial*, 56 D.P.R. 847 (1940). Lo que se requiere para quedar cubierto por la ley simplemente es que haya un nexo o relación causal entre la lesión o enfermedad del obrero y el trabajo.

■ Como bien reconoce el comentarista Larson, los casos relacionados con las Leyes de Compensaciones por Accidentes del Trabajo que más problemas y complicaciones han causado son aquellos en que, aunque la ley cubre la lesión y por lo tanto aplica la disposición sobre inmunidad patronal, ésta sin embargo, no provee una compensación para el daño en particular de que se trata. Esto requiere que para poder determinar si bajo las circunstancias específicas de un caso aplica o no la inmunidad patronal que establece el Art. 2 de Ley de Compensaciones por Accidentes del Trabajo, *supra*, haya "que hacer una distinción entre una lesión que no cae dentro de la cubierta fundamental de la ley, y una lesión que sí está cubierta, pero que bajo los hechos específicos del caso la ley no provee compensación". 2A *Larson's Workmen's Compensation Law* Secs. 65.40 y 65.50 (1988). La primera categoría se refiere a todos aquellos casos en que no existe relación entre la lesión y el empleo, o en que el empleado o el patrono se encuentren dentro de una categoría excluida

por la propia ley; mientras que en la segunda categoría se encuentran las lesiones no incapacitantes.([5])

■ La posición prácticamente unánime de los tribunales estatales y federales en Estados Unidos es que si la lesión reclamada es comprendida dentro de la Ley de Compensaciones por Accidentes del Trabajo, el hecho de que el daño no sea compensable no impide la aplicación de la disposición sobre remedio exclusivo. Para que una lesión esté cubierta por la ley, no es prerrequisito el que ésta resulte en una incapacidad compensable. Hay que diferenciar, pues, entre el ámbito de la cubierta y la cubierta en sí (*scope of coverage, not coverage in and of itself*). *Griffin v. United States*, 703 F.2d 321, 322 (8vo Cir. 1983); *Larson's*, supra, Secs. 65.40–65.52; L.F. Samanega, *Worker's Compensation: The Exclusivity Doctrine*, 41 Lab. L.J. 13, 14–16 (1990).

Este principio fue expresado con singular claridad en *Grice v. Suwannee Lumber Manufacturing Company*, 113 So. 2d 742, 746 (1959):

> *Every accidental injury suffered by an employee which arises out of and in the course of his employment is within the scope of the Act if it is of such character that it results, or might have resulted,* in a loss or diminution of earning capacity, either temporary or permanent, or for which the employer is obligated to furnish medical or other benefits. *The fact that in a particular case the injury suffered does not in fact result in a loss or diminution of earning capacity is immaterial.* By accepting the benefits of the Act, with the concomitant right to compensation and medical expenses irrespective of whether the employer is at fault, the employee relinquishes his common law rights to compensation for those elements of damages that normally flow from the injury but, having no relationship to earning capacity, are not compensable under the Act. That the remedy so afforded by the Act is exclusive of all others seems to accord with the prevailing opinion of other courts in the country.

---

([5]) "Nor does the fact that the type of injury the claimant sustained is one for which benefits are not provided take the case outside the purview of the law and permit an action against the employer." L.F. Samanega, *Worker's Compensation: The Exclusivity Doctrine*, 41 Lab. L.J. 13, 16 (1990).

This results in a yielding by both employer and employee of certain rights existing at common law for the new rights and remedies afforded by the Act. *Any contrary interpretation would subject an employer to dual liability for practically every accidental injury suffered by his employees.* The quid pro quo accruing to the employer as represented by the limited liability and exclusiveness of remedy provisions of the Act would be withdrawn. *To construe the Act in any other way would not only be grossly violative of the underlying principles of the Act and injurious to the mutual benefits flowing therefrom, but under such circumstances the Act would be a farce and its ultimate repeal inevitable.*

If the compensation thus provided is considered inadequate or allowance should be made to the employee for all or part of the common law elements or ingredients of relief known to the law of negligence, the change should be effectuated by legislation and not by judicial fiat. (Énfasis suplido.)

■ Cuando un obrero reclama angustias mentales producto de un accidente del trabajo como consecuencia de actuaciones negligentes (*negligent infliction of emotional distress*), el único remedio que tiene a su disposición contra el patrono es el que provee la Ley de Compensaciones por Accidentes del Trabajo. Bajo estas circunstancias, no prosperará una acción civil contra el patrono para reclamar daños por las angustias mentales producto de la actuación negligente, independientemente del hecho de que estos daños sean o no compensables bajo la ley. Véanse: *Godinet v. Thomas*, 824 S.W.2d 632, 633 (1991); *McAlister v. Medina Elec. Co-op., Inc.*, 830 S.W.2d 659, 663 (1992); *Lawson v. Electronic Data Systems, Inc.*, 584 N.Y.S.2d 359 (1992).

■ Cabe señalar, además, que con relación a las leyes sobre compensación laboral, se ha reconocido que cuando el obrero sufre un accidente en el desempeño de un requisito que le impone el patrono para la continuidad del empleo, éste se considerará ocurrido en el curso del empleo. Véanse: *Shannon v. St. Louis Bd. of Ed.*, 577 S.W.2d 949, 952 (1979); *City of Salisbury v. Parks*, 1275, 1277 (Md. App. 1984) (educación continuada); *Maher v. W.C.A.B.*, 661 P.2d 1058, 1060, 1061–1062 (Cal. 1983), (tra-

tamiento médico). Para determinar si dicho accidente es o no compensable al amparo de la Ley de Compensaciones por Accidentes del Trabajo, hay que considerar, entre otros, los factores siguientes: (1) si se trata de un requisito del trabajo y si se hizo por órdenes del patrono, o si por el contrario se trata de un acto voluntario del obrero, aunque mediara una sugestión del patrono; (2) si se realiza para beneficio del patrono o a su requerimiento, y (3) si se hace en cumplimiento de una ley o reglamentación como condición para obtener o conservar el empleo. *Atiles Moreu, Admor. v. Comisión Industrial*, 85 D.P.R. 218, 224 (1962). Como podrá observarse, son elementos esenciales en la determinación del carácter compensable de un accidente de esta naturaleza, el que éste haya sido el resultado de algún apremio del patrono y que el patrono haya derivado algún beneficio de tal acto.

▬▬▬ Resumiendo. Un obrero que sufre una lesión, en el curso de su empleo y como consecuencia de éste, queda cobijado bajo la Ley de Compensaciones por Accidentes del Trabajo. El hecho de que la lesión no resulte en una incapacidad y, por ende, no sea compensable, no afecta la cubierta de la ley. Si es una lesión producto de un accidente del trabajo, le aplica la exclusividad del remedio; o sea, el patrono queda cobijado bajo la inmunidad patronal y el obrero tiene derecho a los beneficios de asistencia médica y apoyo económico que la ley le provee.([6])

▬▬▬ Con relación a la responsabilidad de compañeros empleados, supervisores u oficiales accionistas, a éstos les cobija la inmunidad patronal del Art. 20, *supra*, "cuando la

---

([6]) Una de las excepciones a la aplicación de la norma de inmunidad patronal es cuando el daño lo producen actuaciones intencionales de parte del patrono. *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985). No cabe la menor duda que, tanto bajo nuestra jurisprudencia como bajo la de la mayoría de los estados de Estados Unidos, cuando la acción originadora de los daños es de carácter intencional por parte del patrono, no aplica la cláusula de exclusividad de remedios de las leyes de compensación por accidentes. En estos casos los obreros pueden instar contra el patrono demandas civiles en daños y perjuicios para obtener resarcimiento.

alegada negligencia del co-empleado consiste en alegadamente violentar el deber no-delegable de la corporación de proveer un lugar seguro de empleo ... [El] oficial, agente o empleado será responsable por los daños sufridos por un compañero empleado cuando el acto negligente causante de los mismos sea distinto e independiente del deber del patrono de proveer un lugar seguro de empleo ... [La] responsabilidad de un co-empleado está limitada a sus deberes u obligaciones personales como ciudadano de no causar daño a otras personas conforme el Artículo 1802 del Código Civil y no en el descargo de los deberes generales de su puesto o cargo oficial que ocupa en el negocio del patrono". (Citas omitidas.) *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 D.P.R. 115 (1992).

## III

*Aplicación de las normas de derecho a los hechos*

 La exclusividad de remedio e inmunidad patronal que establece el Art. 20, *supra*, sólo aplica a una reclamación fundamentada en la ocurrencia de una lesión, enfermedad o muerte cubierta por la Ley de Compensaciones por Accidentes del Trabajo. Sin embargo, esto no necesariamente significa que el daño ocasionado por una ocurrencia cubierta por dicha ley sea compensable, total o parcialmente, bajo el esquema administrativo. Al analizar las disposiciones pertinentes de la ley para determinar cuándo aplica la inmunidad patronal, hay que diferenciar entre *el ámbito de la cubierta*, o sea, los "accidentes que pro[vienen] de cualquier acto o función inherente [al] trabajo o empleo y que ocurran en el curso de éste, y como consecuencia del mismo", Art. 2, *supra*, y *la cubierta en sí*, o sea, si los daños que provienen de dicho accidente son o no compensables, total o parcialmente, por el Fondo.

 Cabe señalar que el Fondo absorbe los gastos

médicos en que se ha incurrido con relación a un accidente del trabajo, independientemente de que se produzca una incapacidad o la muerte del obrero. Además compensa, total o parcialmente, los daños físicos o emocionales que provengan de dicho accidente y que, también, produzcan una disminución en la capacidad productiva del obrero. *Vélez, Admor. v. Comisión Industrial*, 91 D.P.R. 480 (1964); *Feliciano Figueroa v. Comisión Industrial*, 84 D.P.R. 196 (1961). No compensa, sin embargo, las angustias mentales y emocionales que produce el accidente laboral si no están acompañadas de la susodicha disminución de capacidad productiva. Por ende, no todos los daños o lesiones dimanantes de un accidente laboral son compensables por el Fondo, aunque con respecto al accidente en sí, por ser del trabajo, el Fondo resulte ser el remedio exclusivo del obrero contra el patrono.(⁷) El accidente en el caso ante nuestra consideración ocurrió como consecuencia de un acto negligente de otro empleado del Estado: un funcionario del Instituto. *F.S.E. v. E.L.A.*, 111 D.P.R. 402, 407 (1981). Fue precisamente al llevar a cabo un acto a instancias y por órdenes del patrono, para beneficio de éste y como condición para la continuidad en el empleo, que ocurrió el accidente. Bajo estas circunstancias, donde el pa-

---

(⁷) Si se estableciera una dicotomía entre los daños emocionales que emanan de un accidente del trabajo y que concurren con daños compensables bajo el Fondo (aquellos que producen una disminución de la capacidad productiva del obrero) y, de otra parte, aquellos daños emocionales o físicos, que no vienen acompañados con daños compensables, ésto tendría el siguiente resultado inevitable: Al obrero que sufre una enorme lesión física que lo incapacita, total o parcialmente, para desempeñar su trabajo (*ie*. el que quedó cuadraplégico), o aquel que sufre una lesión física que aunque no le produce una incapacidad laboral, sí requiere un tratamiento médico y el Fondo incurre en gastos médicos (*ie*. el que quedó impotente), a éstos les aplica la disposición sobre inmunidad patronal y remedio exclusivo, y por ende, no podrán reclamarle al patrono o a sus coempleados por sus intensos sufrimientos mentales y emocionales y por las incapacidades no laborales que hayan podido sufrir. Tampoco los familiares del obrero podrán reclamar contra dicho patrono o coempleados por los daños sufridos como consecuencia del accidente laboral. De otra parte, a un obrero que sufre un accidente laboral, que no va acompañado de daños físicos o emocionales incapacitantes laboralmente, éste y sus familiares sí podrán reclamar contra el patrono o sus coempleados y obtener el resarcimiento de la totalidad de los daños emocionales que les fueron causados. No podemos suscribir esta posición.

trono no incurrió en conducta intencional y donde el acto negligente que se le atribuye al patrono y al coempleado ocurrió como parte normal de la relación de empleo del codemandante Pacheco Pietri como guardia penal, en cumplimiento con un requisito del empleo, no nos cabe la menor duda que existe un nexo causal entre el trabajo y el accidente y que estamos frente a un accidente del trabajo cubierto por la ley. Tampoco existe la menor duda de que la lesión, a pesar de no ser una incapacitante y, por ende no compensable, sí está cubierta por la ley. Es de aplicación, pues, la disposición del Art. 20, *supra*, sobre remedio exclusivo, tanto para el patrono como para los coempleados, supervisores y oficiales.

Por los fundamentos que hemos expuesto, consideramos que el error señalado no se cometió. Al Estado, como patrono, le cobija la exclusividad de remedio del Art. 20, *supra*. El señor Pacheco Pietri sólo tiene derecho al remedio que provee la Ley de Compensaciones por Accidentes del Trabajo.

Por último, quisiéramos hacernos eco de las sabias palabras del comentarista Larson:

> True, in some of the more extreme cases of employer negligence one may understandably feel the urge to chip away at the exclusiveness barrier, but the experience of three-quarters of a century has clearly proved that, once a breach is made in that dam, to accommodate an appealing case there follows a flood of routine cases with no such appeal at all. *Larson's*, supra, Sec. 68.15, págs. 13–58.

Por lo antes expresado, *procede que se dicte sentencia confirmando la recurrida.*

El Juez Asociado Señor Negrón García emitió un voto particular de conformidad. El Juez Asociado Señor Alonso Alonso emitió una opinión disidente, a la cual se unieron los Jueces Asociados Señores Rebollo López y Fuster Berlingeri.

— O —

Opinión disidente emitida por el Juez Asociado Señor Alonso Alonso, a la cual se unen los Jueces Asociados Señores Rebollo López y Fuster Berlingeri.

Hoy la mayoría de este Tribunal interpreta equivocadamente la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 1 *et seq.*, al concluir erróneamente que *cualquier* daño sufrido por un empleado con relación a su empleo constituye un accidente del trabajo cubierto por la ley. Le niega además una compensación de acuerdo con esta ley, y le cierra las puertas de los tribunales a una acción bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, aun cuando reconoce que el Estado actuó negligentemente. Al establecer esta norma se comete, además, una grave injusticia; se establece un precedente funesto para todos los empleados públicos y privados que se sometan a pruebas de detección de sustancias controladas y por causa de negligencia sufran daños emocionales y a su dignidad.

I

*Los hechos*

El 9 de octubre de 1986 el Gobernador de Puerto Rico (Hon. Rafael Hernández Colón) promulgó una Orden Ejecutiva la cual requería que ciertos funcionarios y empleados públicos que ocuparan cargos de naturaleza sensitiva en el Gobierno o que portaran armas de fuego por motivos de su trabajo se sometan a un programa permanente de detección de consumo de sustancias controladas.[1] La Or-.

---

[1] Frente a la agudización del tráfico ilícito de sustancias controladas y el creciente problema de adicción entre sectores cada vez mayores de la población, tanto el Estado como el sector empresarial privado han adoptado políticas más agresivas en cuanto a detectar y detener el consumo de drogas entre sus empleados. Consideraciones importantes de carácter económico y social han promovido este desarrollo. Se

den Ejecutiva del Gobernador del Estado Libre Asociado de Puerto Rico ordena que se administren pruebas confiables que detecten el consumo de sustancias controladas por ciertos funcionarios y empleados públicos. Boletín Administrativo Núm. 4784 de 9 de octubre de 1986, *Exhibit* I. Entre el grupo de empleados gubernamentales a quienes se les requiere someterse a tales pruebas se encuentran todos los oficiales de custodia y empleados y funcionarios que prestan servicio en cada una de las instituciones penales de la Administración de Corrección.([2])

El codemandante recurrente, Virgilio Pacheco Pietri, ocupaba el puesto de guardia penal en el Campamento Penal El Limón de Mayagüez. Por tal motivo fue sometido al programa permanente de detección de sustancias controladas requerido por la referida Orden Ejecutiva del Gobernador Núm. 4784 de 9 de octubre de 1986 (en adelante Orden

---

ha estimado que el abuso de drogas y el alcohol le cuesta a la sociedad norteamericana alrededor de unos ciento treinta y cinco billones de dólares (135,000,000,000) anualmente. De Cresce y otros, *Drug Testing in the Workplace*, Washington, D.C., Ed. BNA Books, 1990, pág. 1.

La reducción de la capacidad productiva de los empleados y la propensión a los accidentes suelen ser consecuencias naturales del consumo de alcohol o sustancias controladas en el empleo. Así por ejemplo, la Administración Federal Antidrogas (*Drug Enforcement Administration*) ha estimado que los usuarios de sustancias controladas reportan cifras de ausentismo dos punto cinco (2.5) veces mayores a los no usuarios y son de tres (3) a cuatro (4) más veces propensos a tener accidentes durante el trabajo. C.M. Cornish, *Drugs and Alcohol in the Workplace*, Illinois, Ed. Callaghan & Co., 1988, pág. 12. Véase, además, L.K. Larson, *Employment Screening*, Nueva York, Ed. Mattew Bender, 1989, Sec. 1.03. En conjunto, se estima que el consumo de alcohol y drogas produce en los empleados alrededor de dieciséis (16) veces más de ausentismo, cuatro (4) veces más accidentes del trabajo, 1/3 más de utilización de beneficios por enfermedad y cinco (5) veces más reclamaciones de compensación que lo producido por un trabajador promedio. Cornish, *op. cit.*, pág. 12. Además, se señala el efecto desmoralizante de tales problemas para los empleados no usuarios. De Cresce y otros, *op. cit.*, pág. 2.

Además de las consideraciones que le impone este consumo de sustancias controladas al Estado en su calidad de patrono, éste le presenta serias consecuencias en cuanto a su función de brindar seguridad y protección a la ciudadanía, combatir el trasiego ilegal de drogas, velar por la salud pública; procurar la rehabilitación de los adictos y mantener un servicio público confiable, íntegro y que sirva de ejemplo a la ciudadanía. Tales consideraciones fueron recogidas en la Orden Ejecutiva del Gobernador, que establece el requisito de someterse a pruebas de detección de consumo de drogas a varios empleados y funcionarios públicos. Véase la Orden Ejecutiva Núm. 4784 de 9 de octubre de 1986, *Exhibit* I, en su parte general.

([2]) Boletín Administrativo Núm. 4784, Art. 2(a)(3).

Ejecutiva). Como parte del programa, el 2 de febrero de 1988 el recurrente donó una muestra de orina a funcionarios del Instituto de Ciencias Forenses (en adelante Instituto) hacia las 3:45 P.M., mientras rendía labores en el Campamento Penal El Limón. Funcionarios del Instituto, a los cuales, por mandato de la Orden Ejecutiva, se les asignó la función de obtener y analizar las muestras, tomaron la orina donada por el recurrente y le asignaron el número de control 12,969 a la muestra. A partir de ese momento, la muestra estuvo bajo el control total y exclusivo del Instituto.

Mediante un documento de 18 de febrero de 1988, el Director del Instituto, Dr. Pío Rechani, le notificó a la Administradora de Corrección, Dra. Mercedes Otero, que el análisis realizado a la muestra de orina del recurrente mostraba un resultado de "positivo corroborado para cocaína".

En vista del resultado informado, la Administradora de Corrección citó al recurrente para una entrevista el sábado, 12 de marzo de 1988. Allí le informó el resultado positivo a cocaína del análisis referido y tomó contra éste una serie de medidas administrativas que incluía, entre otras, el requerirle que se sometiera a un tratamiento en el Departamento de Servicios Contra la Adicción (D.S.C.A.).(3) El recurrente se sometió a las medidas impuestas no sin antes reclamar que se había cometido una equivocación.

*Luego de varias gestiones realizadas por el recurrente para que se le proveyera una muestra de la orina donada por él para enviarla a un laboratorio privado, y de amenazar con acudir a los tribunales de habérsele negado dicha*

---

(3) Existe controversia de hechos sobre cuáles fueron las sanciones específicas impuestas al recurrente, además de exigírsele que se sometiera a un tratamiento en el Departamento de Servicios Contra la Adicción y su reasignación a tareas especiales que no conllevaran contacto con la población penal y el uso de armas de fuego. Éstas sólo son pertinentes, sin embargo, en cuanto a la evaluación de los daños reclamados por los demandantes.

*solicitud*,([4]) así, pues, el doctor Rechani se comunicó mediante Carta de 10 de mayo de 1988 con el recurrente y su abogado reconociendo que se había cometido un error en su caso.([5])

El número de control de la muestra analizada y que resultó positivo fue el 11,969. La muestra tomada a Pacheco Pietri, que había sido marcada con el número de control 12,969, dio un resultado negativo. Según admitido por el Director del Instituto, lo que sucedió fue que se confundieron las muestras por un error de algún empleado del Instituto.

Por estos hechos, el 7 de junio de 1988 los recurrentes incoaron una acción en daños y perjuicios contra los demandados. Alegaron sufrimientos y angustias mentales y emocionales con motivo de la negligencia del Instituto y de las medidas disciplinarias tomadas contra el recurrente por parte de la Administradora de Corrección.

Luego de una serie de incidentes procesales, el Estado presentó la defensa afirmativa de inexistencia de causa de acción al amparo de la inmunidad patronal provista por el Art. 20 de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 21. Después de haber examinado los correspondientes memorandos de derecho presentados por las partes, el tribunal de instancia (Hon. Germán J.

---

([4]) En los párrafos del 13 al 19 de su demanda, la parte recurrente alegó haberle requerido en dos (2) ocasiones (Cartas de 23 de marzo y 19 de abril de 1988) a la Dra. Mercedes Otero que se pusiera a su disposición una porción de la muestra de orina donada, quien finalmente respondió informándoles que se comunicaran con el doctor Rechany. Alega, además, haberse comunicado con el doctor Rechany quien originalmente se negó a otorgar la muestra, por lo cual los demandantes amenazaron con instar acción legal. Tales alegaciones fueron aceptadas por los demandados en su contestación a la demanda. Alegación responsiva Núm. 2.

([5]) La carta enviada al recurrente lee en su parte pertinente como sigue:

*"Debido a un error involuntario,* se informó la muestra número 12969, para detectar sustancias controladas como correspondiente al Sr. Virgilio Pacheco Pietri, placa 1142. En realidad el número correcto de la muestra que se analizó y resultó *positivo fue otra muestra con un número similar.*

"Incluyo fotocopia del resultado de la muestra 12969 correspondiente a usted, en la cual se determinó que no había ninguna clase de sustancia controlada.

"Espero esto no le cause mayor inconveniente." (Énfasis suplido.) *Exhibit* XIII.

Brau, Juez) *revocó la sentencia parcial* —dictada el 10 de marzo de 1989— *mediante la cual había determinado negligencia por parte de los demandados* y, mediante Sentencia de 17 de agosto de 1989 desestimó la demanda de los recurrentes. Debido a esta última sentencia, acudieron ante nos los demandantes argumentando que el tribunal de instancia erró al dictaminar que la acción de negligencia en que incurrió el demandado estaba vedada por el Art. 20 de la Ley de Compensaciones por Accidentes del Trabajo, *supra*. Le asiste razón a los recurrentes.

## II

*La inmunidad patronal y el concepto de lesión o accidente compensable bajo la Ley de Compensaciones por Accidentes del Trabajo*

La legislación sobre la compensación por los accidentes del trabajo persigue el interés social de proveer un remedio eficiente y rápido para aquellos quienes, al ser víctimas de un *accidente o enfermedad* producto del trabajo que desempeñan, ven parcial o totalmente afectada de forma temporal o permanente su capacidad para proseguir procurándose el sustento diario mediante la labor remunerada. Para éstos y para aquellos que dependen económicamente de su labor, se ha establecido un sistema de protección social que provee para el sostenimiento económico y tratamiento médico adecuado, colocando la carga de la responsabilidad por el sostenimiento financiero de éste en los patronos. Véanse: *Alonso García v. Comisión Industrial*, 103 D.P.R. 183 (1974); *Rivera v. Comisión Industrial*, 55 D.P.R. 878 (1940); A. De Jesús Matos, *Los Accidentes del Trabajo*, San Juan, Ed. Baldrich, 1945.

El interés de procurar un medio efectivo para satisfacer la responsabilidad de la sociedad frente a la familia y al trabajador *fallecido, incapacitado* o *lesionado* mientras laboraba en una actividad productiva, y de imponer la apor-

tación patronal al sistema a cambio de brindarles inmunidad por reclamaciones de daños y perjuicios, ha sido el principio rector en el desarrollo de nuestras leyes de compensación a obreros desde la aprobación de la primera ley, Ley Núm. 19 de 13 de abril de 1916, hasta la aprobación de la ley vigente, Ley Núm. 45 de 18 de abril de 1935, según enmendada, 11 L.P.R.A. sec. 1 *et seq*. De Jesús Matos, *op. cit.*

Por razón de su carácter reparador y de protección social, la legislación sobre la compensación por accidentes del trabajo provee una indemnización automática al empleado independientemente de si el daño sufrido se debe a su propia culpa o negligencia, excepto en tres (3) circunstancias particulares:

> No son accidentes compensables del trabajo y no darán por consiguiente, derecho a compensación al obrero o empleado o a sus beneficiarios de acuerdo con este Capítulo, los que ocurren en las siguientes circunstancias:
> (1) Al tratar el obrero o empleado de cometer un delito o de lesionar a su patrono o a cualquier otra persona, o cuando voluntariamente se causare la lesión.
> (2) Estando el obrero o empleado embriagado, siempre que la embriaguez fuere la causa del accidente.
> (3) Cuando la imprudencia temeraria del obrero o empleado haya sido la única causa de la lesión. 11 L.P.R.A. sec. 5.

Como consecuencia del carácter compulsorio del seguro y de las penalidades impuestas por el estatuto, el Art. 20 de esta ley, *supra*, establece la inmunidad del patrono asegurado en cuanto a las acciones de daño por accidentes del trabajo sufridos por el obrero a causa de la negligencia del patrono, 11 L.P.R.A. sec. 21. "[C]uando un empleado sufre *lesiones, enfermedades*, se *inutiliza o pierde la vida* como *consecuencia de 'cualquier acto o función inherente a su trabajo'* y su patrono está debidamente asegurado de acuerdo con la ley, su derecho a obtener resarcimiento está limitado [al pago de] la compensación dispuesta en el estatuto, la cual es administrada a través del Fondo del Seguro

del Estado. ... El obrero así lesionado carece de una causa de acción para demandar a su patrono ante los tribunales de justicia por los daños y perjuicios sufridos, irrespectivamente del grado de negligencia patronal que pueda haber mediado." (Énfasis suplido.) *Santiago Hodge v. Parke Davis Co.*, 126 D.P.R. 1, 8 (1990). Véase, además, *Ruiz Díaz v. Vargas Reyes*, 109 D.P.R. 761, 763–764 (1980).

Ahora bien, el Art. 20 de la Ley de Compensaciones por Accidentes del Trabajo, *supra*, establece la exclusividad del remedio y concede inmunidad al patrono contra cualquier otra reclamación que pudiera instarse en su contra, *sólo en caso de que esta* reclamación se sostenga debido a la ocurrencia de una *lesión, enfermedad* o *muerte* cubierta por las disposiciones de la ley. El texto del artículo es claro en cuanto a que si ocurre *un daño* no cubierto por la ley el patrono no puede escudarse bajo la inmunidad allí provista.

*Artículo 20—Exclusividad del remedio provisto*

Cuando el patrono asegure sus obreros y empleados de acuerdo con el presente Capítulo, el derecho aquí establecido para obtener compensación será el único remedio en contra del patrono, aun en aquellos casos en que se haya otorgado el máximo de las compensaciones o beneficios de acuerdo con el mismo; *pero en el caso de accidentes, enfermedades o muerte de los obreros o empleados no sujetos a compensación de acuerdo con este Capítulo, la responsabilidad del patrono es y continuará siendo la misma que si no existiere el presente Capítulo.* (Énfasis suplido.) 11 L.P.R.A. sec. 21.

En aquellos casos en los cuales un empleado presente una reclamación contra su patrono por vía de una reclamación civil en los tribunales y se levante la defensa de inmunidad patronal por la parte demandada, corresponde en primera instancia evaluar el hecho de si el accidente alegado en la demanda está cubierto por la Ley de Compensaciones por Accidentes del Trabajo y si se ha producido la correspondiente compensación por parte del Fondo del Se-

guro del Estado (en adelante F.S.E.). *B.C.R. Co., Inc. v. Tribunal Superior*, 100 D.P.R. 754, 758–759 (1972).

El Art. 2 de la Ley de Compensaciones por Accidentes del Trabajo al establecer los obreros y empleados comprendidos por el estatuto expone, en su parte pertinente, como sigue:

> Las disposiciones de este Capítulo serán aplicables a todos los obreros y empleados que trabajen para los patronos a quienes se refiere el párrafo siguiente, *que sufran lesiones o se inutilicen, o que pierdan la vida por accidentes que provengan de cualquier acto o función inherente a su trabajo o empleo y que ocurran en el curso de éste, y como consecuencia del mismo o por enfermedades o muertes derivadas de la ocupación, según se especifican en la sección siguiente.* (Énfasis suplido.) 11 L.P.R.A. sec. 2.

En ese sentido, para que una reclamación pueda considerarse como producto de un accidente del trabajo cubierto por la ley *se requiere, en primera instancia, que éste surja a manera de muerte, enfermedad o lesión.* Véase *Hernández Nieves v. Comisión Industrial*, 90 D.P.R. 340, 348 (1964). Además, se requiere, según hemos establecido en ocasiones anteriores, que cumpla con los siguientes requisitos sobre la causalidad con el empleo: (1) provenir de cualquier acto o función del obrero; (2) ser inherente al trabajo o empleo que desempeña el obrero; (3) ocurrir en el curso del trabajo, y (4) ser consecuencia de éste. *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985); *Admor., F.S.E. v. Comisión Industrial*, 101 D.P.R. 56 (1973); *Santiago Hodge v. Parke Davis Co.*, supra; *Cardona v. Comisión Industrial*, 56 D.P.R. 847 (1940); *Montaner, Admor. v. Comisión Industrial*, 53 D.P.R. 197 (1938). Si estos requisitos están ausentes, la reclamación no estará cubierta por la ley. *Cardona v. Comisión Industrial*, supra; *Montaner, Admor. v. Comisión Industrial*, supra. Examinemos tales requisitos.

El primero de estos requisitos, el cual omite examinar la opinión mayoritaria y por lo cual llega al resultado equivocado, se refiere a la naturaleza del evento por el cual se

reclama. La reclamación tiene que originarse en la ocurrencia de una *lesión, enfermedad o muerte. El término lesión, al igual que los términos enfermedad y muerte, se refiere a un padecimiento, dolencia o herida de origen orgánico, fisiológico o corporal.*(⁶) Es precisamente por la incapacidad que pueda producir este tipo de daño corporal que limita o destruye la capacidad productiva del obrero, que intenta compensar el estatuto, *y no por todos aquellos daños y sufrimientos morales o emocionales que naturalmente se deriven de aquéllos.*(⁷) Esto es así puesto que el estatuto es meramente remediador, dirigido a *compensar* por la reducida capacidad productiva del obrero con el fin de atender con prontitud las súbitas necesidades económicas y médicas del obrero y sus dependientes, y no a resarcir la totalidad de los daños sufridos. Véanse: *Feliciano Figueroa v. Comisión Industrial*, 84 D.P.R. 196 (1961); *Vélez, Admor. v. Comisión Industrial*, 91 D.P.R. 480 (1964); *Alonso García v. Comisión Industrial*, supra. Por esta razón, para estar cubiertos por la ley, el daño reclamado debe ser producto de una *lesión o enfermedad* que disminuya de alguna manera la capacidad del obrero de emplearse (requiriéndole atención médica), *o que le cause la muerte.* La mera lectura de la Ley de Compensaciones por Accidentes del Trabajo, en particular de los Arts. 2–3B, 11 L.P.R.A. secs. 2–4a, así lo confirman.

Somos conscientes de que, en ocasiones anteriores, hemos mencionado a manera de *dictum* y muy incidentalmente que "el vocablo lesión se ha ampliado [en jurisdic-

---

(⁶) R. Barcia, *Gran Diccionario de Sinónimos Castellanos*, Buenos Aires, Compañía Impresora Argentina, 1950. En términos generales, Barcia expone que la palabra lesión se utiliza para cualificar la naturaleza material o física y profunda de un daño.

(⁷) Utilizaremos en adelante el término "daños o angustias *emocionales*" en sustitución del término jurisprudencial de "daños y angustias morales y mentales". Esto es con el propósito de evitar confusión entre este último y el concepto de enfermedad o padecimiento mental, el cual, por tratarse de una enfermedad o condición corporal o fisiológica, se encuentra indudablemente incluida dentro del concepto de lesión o enfermedad articulado en la ley. *Morell v. F.S.E.*, 110 D.P.R. 709 (1981); *Díaz Ortiz v. F.S.E.*, 126 D.P.R. 32 (1990).

ciones federales] para incluir no sólo daños físicos sino emocionales". *Alonso García v. Comisión Industrial*, supra, pág. 696. Véase, además, *Odriozola v. S. Cosmetic Dist. Corp.*, supra, pág. 501. Hoy era necesario que delimitásemos la amplitud jurídica de esta expresión.

Un obrero puede sufrir daños emocionales en relación con su empleo, bien porque éstos se desprendan de la ocurrencia de una lesión o el desarrollo de una enfermedad ocupacional, o bien porque se produzca un incidente que lo humille o lo hiera espiritual, moral, intelectual o sentimentalmente. *Los primeros, daños emocionales que emanan de una lesión o enfermedad ocupacional, están cubiertos por el estatuto, no siendo reclamables por la vía ordinaria*, aun cuando el estatuto no provee para su resarcimiento. L.K. Larson, *Employment Screening*, Nueva York, Ed. Mattew Bender, 1989, Sec. 65.23. El estatuto veda toda reclamación de estos daños mediante causa de acción independiente de la reclamación exclusiva provista para compensar por el accidente o enfermedad ocupacional de la cual se desprenden.

Sin embargo, en aquellos casos en que el daño emocional *no emana de una enfermedad o lesión producto del empleo*, el incidente originario no está comprendido en la ley, por lo cual será reclamable por la vía ordinaria.

Por ello, el resarcimiento de los daños emocionales, que en relación con el desempeño de sus funciones sufra un empleado a causa de la culpa o negligencia de un patrono, dependerá de si la reclamación *nace de la ocurrencia de una lesión, enfermedad o muerte en el contexto del trabajo* o, por el contrario, de una ofensa moral o emocional. *Cf. Parrilla v. Ranger American of P.R.*, 133 D.P.R. 263 (1993); *Porto y Siurano v. Bently P.R., Inc.*, 132 D.P.R. 331 (1992); *Rodríguez Meléndez v. Sup. Amigo, Inc.*, 126 D.P.R. 117 (1990).

*En resumen, si la reclamación emana de la ocurrencia de una lesión corporal, enfermedad ocupacional o muerte*

*en el contexto laboral, la acción ordinaria contra el patrono estará vedada aun cuando ésta se proyecte como un daño de consecuencias eminentemente no físicas. En cambio, si la fuente del daño, en derecho, es no físico y si los perjuicios son típicamente no físicos, al sumarse el daño físico a la lista de perjuicios como agravante, la acción por la vía ordinaria de la acción en daños no está prohibida.*

Al hacer tal determinación, no debemos atender a la naturaleza física o emocional de los daños reclamados, o a la prevalencia de un tipo de daño sobre otro, *Doe v. South Carolina State Hosp.*, 328 S.E.2d 652, 656–657 (1985), sino a la naturaleza o esencia *del evento que da origen a la reclamación* de éstos. Véanse: *Rusell v. Mass. Mut. Life Ins. Co.*, 722 F.2d 482, 494 (9no Cir. 1983); *Vigil v. Safeway Stores, Inc.*, 555 F. Supp. 1049, 1050–1051 (D. Col. 1983); *Luna v. City and County of Denver*, 537 F. Supp. 798, 801 (D. Col. 1982); *Guidry v. Durkin*, 834 F.2d 1465, 1471–1472 (9no Cir. 1987).

En *Odriozola v. S. Cosmetic Dist. Corp*, supra, resolvimos que la lesión mental desarrollada por un empleado ilegalmente cesanteado en violación de las disposiciones de la Ley Núm. 100 de 30 de junio de 1959 (29 L.P.R.A. secs. 146–151), la cual emanó de estrictos daños emocionales que el despido referido produjo al demandante, no podía considerarse como producto de un accidente del trabajo, por lo cual la demanda contra el patrono no estaba vedada por la cláusula de remedio exclusivo del Art. 20 de la Ley de Compensaciones por Accidentes del Trabajo, *supra*. El contrasentido de que el mero surgimiento de una lesión o enfermedad de la mente, o de cualquier otro órgano corporal, que emana de un daño puramente moral o emocional original, impida el que el obrero pueda reclamar justo resarcimiento por la vía ordinaria, resulta evidente si consideramos que, según tal doctrina, el patrono que menos daños causa (sólo emocionales) estaría sujeto a acciones personales en su contra, mientras el que con mayor inten-

sidad inflige daño moral, hasta el punto de crearle una condición fisiológica al empleado, resulta inmune, recibiendo el empleado una compensación menor que la que tendría derecho a reclamar aquel que sólo sufre daños emocionales. Véase *Hart v. National Mortg. & Land Co.*, 235 Cal. Rptr. 68, 73 (1987).

Al entender que son reclamables por la vía ordinaria aquellos daños que nacen como puramente emocionales, es decir, que no surjen como consecuencia de una lesión o enfermedad las cubiertas por el estatuto, *Arroyo v. Plaza Provision Co.*, 68 D.P.R. 962, 967 (1948), es menester aclarar que éstos no deben confundirse con el desarrollo de enfermedades o condiciones mentales, como por ejemplo neurosis y depresión, o con el desarrollo de condiciones como el *stress* o fatiga producto del trabajo. Éstas son dolencias *corporales o patológicas* que afectan esencialmente al organismo humano *y no su dignidad*. En el caso de estas últimas *"condiciones* emocionales", hemos resuelto que serán compensables según la Ley de Compensaciones por Accidentes del Trabajo cuando "además de la necesaria relación causal entre la condición y el empleo, dicha condición origina por sí misma una incapacidad para el trabajo o agrava una incapacidad existente, [debiendo] probarse de manera convincente mediante prueba pericial basada en exámenes psiquiátricos adecuados". *Morell Morell v. Comisión Industrial*, 110 D.P.R. 709, 710–711 (1981). Véanse: *Díaz Ortiz v. F.S.E.*, 126 D.P.R. 32 (1990); *González Santiago v. F.S.E.*, 118 D.P.R. 11, 13 (1986); *Resto Casillas v. Colón González*, 112 D.P.R. 644 (1982).

## III

*Los requisitos de relación causal con el empleo*

Ahora bien, no basta con determinar si la reclamación nace de una enfermedad, lesión o muerte cubierta por la ley. El juzgador, además, debe determinar —dadas las cir-

cunstancias particulares de cada caso— la relación causal entre la alegada enfermedad, lesión o muerte y el trabajo desempeñado por el obrero. Es decir, que cumpla con los requisitos de provenir de cualquier acto del obrero, de ser inherente al trabajo desempeñado y de ocurrir en el transcurso y como consecuencia del empleo. *Odriozola v. S. Cosmetic Dist. Corp.*, supra.

Provienen de un acto o función del obrero y son inherentes al trabajo aquellos daños que surjen de una actuación del empleado y que éste queda sujeto a aquéllos por consecuencia de las responsabilidades y demás actos requeridos por las funciones que realiza.([8])

> La frase "como consecuencia del" empleo expresa el requisito de que debe haber una relación causal entre las condiciones que el patrono establece para el empleado y la lesión resultante de éste. *La relación causal requerida ... existe si el empleo, por razón de su naturaleza, obligación o incidentes, puede razonablemente determinarse que es la fuente del riesgo que produce la lesión. La relación causal como tal fuente surge ... si el empleo, como parte de las condiciones del trabajo, peculiarmente expone al empleado a peligros externos por virtud de lo cual queda sujeto a riesgos distintos o mayores que los que prevalecerían si aquél estuviese atendiendo sus asuntos personales ordinarios.* (Énfasis en el original.) *Gallart, Admor. v. Comisión Industrial*, 87 D.P.R. 17, 28 (1962).

Respecto al requisito de "en el curso del empleo", hemos resuelto que se refiere a factores de tiempo y lugar, y que quiere decir que para ser compensable, la lesión debe ocurrir dentro de ciertos límites de tiempo y espacio en relación con el empleo. *Gallart, Admor. v. Comisión Industrial*, supra.

Estos criterios son de aplicación flexible, a tono con el carácter remedial del estatuto. "Reiteradamente hemos re-

---

([8]) En *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985), señalamos que los daños producto de un despido ilegal no pueden alegarse como provenientes de un acto inherentemente ligado al empleo ni tampoco de un acto del obrero, *sino de una actuación intencional del patrono. Nuestro análisis no afecta la doctrina pautada en el caso "Odriozola", la cual continúa en vigor.*

suelto que por ser la Ley de Compensación por Accidentes del Trabajo un estatuto remedial, debe interpretarse liberalmente a favor del obrero." *Santiago v. Kodak Caribbean, Ltd.*, 129 D.P.R. 763, 769 (1992), y casos allí citados. A base de las circunstancias particulares de cada caso, sus disposiciones se "interpretará[n] liberalmente, y cualquier duda razonable que en su aplicación surgiere en cuanto a la existencia de relación causal entre el trabajo u ocupación del obrero o empleado y la lesión, incapacidad o muerte, o el carácter ocupacional de una enfermedad, *deberá resolverse a favor del obrero o empleado*, o sus beneficiarios" (11 L.P.R.A. sec. 2) "a base del punto de vista del sentido común del hombre promedio". (Énfasis suplido.) *Atiles, Admor. v. Com. Industrial y Ortiz*, 74 D.P.R. 950, 960 (1953).

## IV

*Aplicación doctrinaria a los hechos del caso*

En su comparecencia ante nos, el Hon. Procurador General planteó lo siguiente:

> En el presente caso Pacheco Pietri ocupa una plaza de Oficial de Custodia en la Administración de Corrección. Como parte de su empleo y en virtud de la Orden Ejecutiva Núm. 4784, los oficiales de custodia deben someterse periódicamente a pruebas de orina para detectar la presencia de sustancias controladas. Es en el cumplimiento de este requisito exigido por la naturaleza del trabajo que desempeña el recurrente, que ocurre el acto que produce los alegados daños que aquí se reclaman, daños emocionales ocasionados como consecuencia de un error cometido por otro empleado del Estado quien, como antes expusimos, consignó equivocadamente en el expediente del recurrente, el resultado de un análisis de orina perteneciente a otro empleado, cuyo resultado había dado positivo de cocaína. La lesión sufrida por el recurrente, sin lugar a dudas, es inherente a su empleo y ocurrió en el curso y como consecuencia de éste. Alegato del Procurador General, págs. 15–16.

Independientemente de si la Orden Ejecutiva del Gober-

nador tuvo el efecto de hacer que las pruebas de detección de drogas fuesen un requisito de empleo para los oficiales de custodia, *este factor por sí solo* no convierte la negligencia en el manejo y tramitación de éstas en un accidente del trabajo. El error que produjo los daños, cuya indemnización reclaman los recurrentes, *no proviene de un acto o función del empleado*. El requerimiento al empleado se limita a que éste done su orina como parte del programa de detección permanente. El "accidente", en este caso, surgió *posteriormente, por error de un tercero y sin intervención o contacto alguno del recurrente*. El "daño" se debió a un acto alegadamente negligente que ocurrió en las facilidades del Instituto, cuando éste poseía el control total y exclusivo de la muestra. Dadas tales circunstancias de tiempo y lugar, en las cuales ocurre el evento causante de los daños, resulta irrazonable concluir —como concluye la mayoría del Tribunal— que éste se produjo en el curso del trabajo del obrero. Tampoco podemos determinar que se trata de una consecuencia de las labores desempeñadas por el recurrente.

Más aún, surge claramente de los hechos que se trata de una reclamación de daños de naturaleza *puramente emocional*. La reclamación *no nace* como producto de haber sufrido *una lesión física* que produzca incapacidad o disminuya la habilidad del recurrente para procurarse el sustento diario por la cual deba ser compensado. La interpretación liberal *a favor del obrero* que exige el estatuto impide extender el manto de inmunidad patronal a situaciones como éstas *para las cuales el estatuto no provee ninguna compensación*. *"[U]na disposición estatutaria que de alguna forma limite el derecho de los perjudicados a solicitar indemnización, debe examinarse restrictivamente."* (Énfasis suplido.) *Zambrana Maldonado v. E.L.A.*, 129 D.P.R. 740, 756 (1992); *Flores Román v. Ramos González*, 127 D.P.R. 601 (1992); *Vázquez Negrón v. E.L.A.*, 109 D.P.R. 19 (1979).

En vista de lo anterior, entiendo que incidió el tribunal de instancia al desestimar la demanda incoada por los recurrentes de acuerdo con el fundamento de inexistencia de causa de acción debido a la cláusula de exclusividad de remedios contenida en el estatuto.

## VI

*Debido cuidado y deber de previsibilidad en el manejo de las pruebas*

Una vez determinado que el empleado que ha sufrido daños y angustias morales y emocionales tiene una causa de acción en daños y perjuicios por la negligencia del patrono en el manejo de las pruebas de droga, dirimimos cuál es el nivel de cuidado exigido al Estado en la obtención, procesamiento, notificación y demás trámites relacionados a tales pruebas; controversia que no considera la mayoría del Tribunal al llegar al resultado enunciado. Veamos.

El Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, dispone, en su parte pertinente, que:

> El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado.

Al amparo del Art. 1802 de nuestro Código Civil, *supra*, todo daño o perjuicio moral o material da lugar a la reparación correspondiente si concurren tres (3) elementos: primero, que efectivamente se haya producido un daño; segundo, que el demandado haya incurrido en un acto u omisión negligente o culposo, y tercero, que se establezca la existencia de un nexo causal entre el daño sufrido y el acto u omisión culposo o negligente. *Torres Maldonado v. J.C. Penney Co.*, 130 D.P.R. 546 (1992); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990); *Soc. de Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94 (1986); *Jiménez v. Pelegrina*

*Espinet*, 112 D.P.R. 700 (1982); *Hernández v. Fournier*, 80 D.P.R. 93 (1957).

El grado de cuidado que nuestro ordenamiento civil requiere es el exigible a un hombre prudente y razonable ante las circunstancias del caso. *Ortiz v. Levitt & Sons*, 101 D.P.R. 290 (1973); *Hernández v. La Capital*, 81 D.P.R. 1031, 1038 (1960); *Elba A.B.M. v. U.P.R.*, supra. "De esta manera el acto negligente se define como el quebrantamiento del deber impuesto o reconocido por ley de ejercer, como lo haría un hombre prudente y razonable, aquel cuidado, cautela, circunspección, diligencia, vigilancia y precaución *que las circunstancias del caso exijan*, para no exponer a riesgos previsibles e irrazonables de daños como consecuencia de la conducta del actor, a aquellas personas que, por no estar ubicadas muy remotas de éste, un hombre prudente y razonable hubiese previsto, dentro de las circunstancias del caso, que quedaban expuestas al riesgo irrazonable creado por el actor .... Esto significa que en cada situación de hechos, la ley impone al actor observar un 'estándar de cuidado' que será determinado por las circunstancias particulares del caso." H.M. Brau, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. 1, pág. 183. Véanse: *Cabrera v. Asoc. de Señoras Damas*, 96 D.P.R. 775 (1968); *Elba A.B.M. v. U.P.R.*, supra. "Un elemento esencial de la responsabilidad por culpa o negligencia es el factor de la previsibilidad y el riesgo involucrado en el caso específico. El grado de previsibilidad requerido en cada caso en particular depende del estándar de conducta aplicable. El deber de cuidado incluye tanto la obligación de anticipar como la de evitar la ocurrencia de daños cuya probabilidad es razonablemente previsible. 'Pero la regla de anticipar el riesgo no se limita a que el riesgo preciso o a las consecuencias exactas arrostradas debieron ser previstas. Lo esencial es que se tenga el deber de prever en forma general conse-

cuencias de determinada clase' ". (Citas omitidas.) *Elba A.B.M. v. U.P.R.*, supra, pág. 309. "Lo determinante es si era de esperarse la ocurrencia del daño." *Torres Maldonado v. J.C. Penney Co.*, supra, pág. 559.

Las pruebas de detección de consumo de sustancias controladas consisten en el análisis del contenido químico en la sangre u orina del donante. Su creciente implantación en el sector privado, en el campo deportivo y en el sector de servicio público ha sido impugnada en Estados Unidos por aquellos a quienes se les requiere —so pena de sanciones administrativas— donar muestras de su sangre u orina para el correspondiente análisis químico.[9] Ciertamente se trata de un asunto que encierra delicados e importantes

---

[9] Bajo la Constitución federal, la validez constitucional de las pruebas químicas de detección de consumo de drogas ha sido sancionada por el Tribunal Supremo federal en los casos *Skinner v. Railway Labor Executives' Assn*, 489 U.S. 602 (1989), y *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), ambos decididos el 22 de marzo de 1989. En estos, el Tribunal Supremo reconoció que si bien las pruebas de detección de drogas y alcohol constituyen un registro en cuanto existe una válida expectativa de privacidad del empleado público según la Cuarta Enmienda de la Constitución federal, la regla que aplica para determinar la validez constitucional de tales pruebas es la de establecer un balance de intereses entre los derechos del individuo y el interés del Estado, por lo cual bajo *ciertas circunstancias particulares de necesidad especial* por parte del Estado, se sostiene la validez constitucional de estos registros sin previa orden judicial basada en causa probable por sospecha individualizada.

Recordemos, sin embargo que las interpretaciones del Tribunal Supremo federal en cuanto a las protecciones de la Cuarta Enmienda y otras garantías constitucionales nos obligan sólo en cuanto establecen el contenido *mínimo* de nuestra Carta de Derechos. *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992). Las garantías de nuestra Constitución, particularmente en cuanto al derecho a la intimidad y a la protección contra registros y allanamientos irrazonables, son de factura más ancha que las de la Constitución federal. *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 440 (1975); *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 205 (1984); *López Vives v. Policía de P.R.*, 118 D.P.R. 219, 226 (1987); *Pueblo v. Rivera Colón*, 128 D.P.R. 672 (1991). Además, el derecho a la intimidad en Puerto Rico existe *ex proprio vigore*, *E.L.A. v. Hermandad de Empleados*, supra; *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982), y es oponible a personas privadas, *Colón v. Romero Barceló*, supra; *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 64 (1986).

No habiendo sido impugnado o planteado ante nuestra consideración, no entramos a considerar si en el contexto de la Orden Ejecutiva del Gobernador las pruebas de detección de drogas mediante el análisis químicos de la orina de los empleados cumplen con el requisito de excepción por *necesidades especiales* bajo la Cuarta Enmienda de la Constitución federal, según resuelto en los casos *Skinner v. Railway Labor Executives Ass'n*, supra, y *National Treasury Employees Union v. Von Raab*, supra, o si cumpliendo con éstos, resultan o no permisibles bajo el análisis de balance de intereses con respecto al derecho a la intimidad que hemos adoptado en nuestra jurisdicción.

intereses sociales en conflicto, lo cual le impone al Estado, a los efectos de la presente controversia, un alto grado de responsabilidad y deber de diligencia en cuanto al trámite general relativo a las pruebas. Trátandose de un asunto que necesariamente incide sobre derechos constitucionales fundamentales,[10] mayor es el deber de cuidado exigible al Estado que se sirve de éstas.

En particular, al analizar las pruebas consideradas en la Orden Ejecutiva de marras es necesario tener presente que no sólo la fase de recolección y análisis de las muestras de fluidos corporales para detectar la presencia de sustancias controladas se presenta como problemática en cuanto a derechos ciudadanos fundamentales, sino también que el manejo de los resultados y su posterior trámite de información a las autoridades correspondientes requieren salvaguardas adicionales en cuanto al derecho a la intimidad, dignidad, honra y reputación del empleado. La obtención de un resultado positivo impone de manera casi automática un *estigma* acerca de la reputación del empleado como un individuo psicológicamente enfermo y de dudosa moralidad. No necesitamos abundar sobre las consecuencias previsibles que impone el estigma de adicto o usuario de drogas al individuo tanto en el trabajo como en su comunidad. Éstas no son menos significativas por el hecho de que, lejos de permitirse acciones disciplinarias en su contra, la Orden Ejecutiva requiera su referimiento a un programa de rehabilitación en D.S.C.A. El requisito de someterse a un programa de rehabilitación, aunque loable, necesariamente limita las demás medidas de confidencia-

---

[10] Nuestra Constitución garantiza la inviolabilidad de la dignidad del ser humano; el derecho de toda persona a la protección de la ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar; la protección a los trabajadores contra riesgos para su salud o integridad personal en su trabajo o empleo, y el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros y allanamientos irrazonables, y a que sólo se expidan mandamientos que autoricen registros por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, que describan particularmente el lugar a registrarse y las personas a detenerse o las cosas a ocuparse. Art. 2, Secs. 1, 8, 16 y 10, Const. E.L.A., L.P.R.A., Tomo 1.

lidad en cuanto al manejo de las pruebas que establece la Orden Ejecutiva.([11]) Precisamente las diversas garantías de confidencialidad en el trámite de la información de los resultados y el tratamiento de rehabilitación *constituyen un acto de previsión* respecto a los problemas que en cuanto a la intimidad y reputación del empleado pueden causar estas pruebas.

Estos particulares deben considerarse en conjunto con los problemas de confiabilidad que presentan estas pruebas químicas. Sobre ello se ha reconocido la propensión al error en tales pruebas, ya sea por error humano en la interpretación de sus resultados, errores en la calibración de los instrumentos utilizados o por razón del consumo de sustancias lícitas de composición química similar a la de sustancias controladas.([12]) La alta probabilidad en términos de obtener falsos positivos (la presencia aparente de una droga en la muestra que como cuestión de hecho no lo está) es recalcada por expertos en el área.([13]) A tales efectos, el deber de diligencia exigible al Estado, ya sea al Instituto en cuanto al manejo, procesamiento y suministro de información respecto a los resultados de estas pruebas de drogas o a los funcionarios administrativos que actúan conforme a éstas, no debe limitarse al cumplimiento estricto con los reglamentos establecidos. Brau, *op. cit.*, pág. 175; *cf. Pacheco v. A.F.F.*, 112 D.P.R. 296 (1982). Éste debe ser examinado a la luz de la magnitud de los derechos ciudadanos afectados, las consecuencias previsibles para la reputación y el buen nombre del empleado y ante las probabilidades significativas de obtener resultados equivoca-

---

([11]) En su Art. 4, Secs. a(1) y 5, esta Orden Ejecutiva establece ciertos salvaguardas en cuanto a la confidencialidad de los resultados y al tratamiento al empleado.

([12]) Véase *National Treasury Employees Union v. Von Raab*, 649 F. Supp. 380, 389 (D. La. 1986).

([13]) Véase Cornish, *op.cit.*, Sec. 1.04; De Cresce y otros, *op. cit.*, pág. 70. Véanse, además: Dubowski, *Drug Testing: Scientific Perspectives*, 11 Nova L. Rev. 415 (1987); Zeese, *Drug Testing Legal Manual*, CBC Publishing Ltd., U.S.A., 1992, págs. 2-21 a 2-31.

dos al realizar éstas. *El Estado, en su interés de utilizar la tecnología más avanzada para adelantar su política pública contra del trasiego de drogas, tiene la obligación de actuar en consideración y con la diligencia que la utilización responsable de éstos exige.*

Conforme determinó el tribunal de instancia en su primera sentencia parcial, el Estado actuó negligentemente en el trámite de las pruebas químicas de detección de consumo de drogas realizadas a los fluidos corporales del recurrente Pacheco Pietri. El error cometido en la tramitación de los resultados evidencia un incumplimiento con el nivel de cuidado requerido que imponían las circunstancias en el caso de autos.

En consecuencia, revocaríamos la sentencia del tribunal de instancia que desestimó la demanda de los recurrentes y devolveríamos el caso para que se proceda a la evaluación de los daños alegados por éstos.

– O –

Voto particular de conformidad del Juez Asociado Señor Negrón García.

I

Acceder a la contención del Guardia Penal Virgilio Pacheco Pietri conllevaría asestar un golpe mortal al diseño establecido en la Ley de Compensaciones por Accidentes del Trabajo y quiebra el principio de inmunidad patronal. 11 L.P.R.A. sec. 21.

No podemos establecer una diferencia entre "daños y angustias morales y mentales", correspondiente al ámbito de la culpa aquiliana, y "daños o angustias emocionales". Con todo respeto, en el fondo esa distinción no es más que un juego de palabras que intenta separar los daños resultantes de una lesión física clásica frente al daño emocional

sin contacto físico. Pasa por alto que una condición emocional, relacionada o no con un padecimiento, dolencia o herida de origen orgánico, fisiológico o psíquico, puede estar cubierta por la Ley de Compensaciones por Accidentes del Trabajo. Por ello, no se justifica crear en nuestro ordenamiento una nueva clase o subespecialización de daños morales, basados exclusivamente en el honor, la dignidad y otros valores humanos respetables e intangibles.

Es erróneo sostener que los daños morales (emocionales) reclamados, como lesión, no surgieron en el desempeño del trabajo de Pacheco Pietri como guardia penal. La muestra de orina era un requisito del empleo —parte del programa de detección permanente de sustancias controladas— al extremo de que de resultar positiva le descualificaba para continuar ocupándolo.

## II

Las causas de un accidente laboral no tienen que surgir en el lugar o facilidades del empleo. Múltiples accidentes laborales acontecen sin ninguna acción u omisión del obrero, pues se originan por errores atribuibles exclusivamente a otros compañeros, estén o no situados cerca o lejos.

No podemos resolver que el "accidente" en este caso surgió posteriormente, *por error de un tercero* y sin la intervención o contacto alguno de Pacheco Pietri. El control, la intervención o grado de participación del obrero en un accidente no es determinante. Si la muestra de orina hubiese sido obtenida, analizada y confundida en un laboratorio —adscrito a la Administración de Corrección— o en una unidad móvil del Instituto de Ciencias Forenses situada a escasa distancia del puesto del guardián de Pacheco Pietri (*on the spot*), ¿era o no en el curso del trabajo?

Por último, difícilmente puede caracterizarse como "tercero" al empleado del Estado que por error involuntario confundió las muestras; a menos que su acción fuera *intencional* y, por excepción, susceptible de generar responsabilidad. Suscribimos la opinión mayoritaria.